Hines, J.
INTRODUCTION
The plaintiff, David Michael (“Michael”), brought this action against the defendants, Trustmark Insurance Company (‘Trustmark”) and Continental Assurance Company (“CNA”), alleging breach of contract and violation of G.L.c. 93A. The complaint alleges that Trustmark, the successor to Continental, failed to pay the plaintiff benefits due to him under a disability policy and that Trustmark violated G.L.c. 93A by failing to make timely payments of the benefits due under the policy. Trustmark filed a counterclaim seeking the repayment of disability benefits paid to Michael during the period when Trustmark alleges that he was ineligible to receive total disability benefits. These claims were tried to this court sitting without a jury over six days in November 2001 and December 2001. The parties presented further ar *246 guments on the G.L.c. 93A claim in August 2002. After considering the testimony of the witnesses and reviewing the exhibits, I make the following findings of fact, rulings of law and order for entry of judgment in this action.
FINDINGS OF FACT
A. The Disability Policy
On January 26, 1986, Michael purchased a disability insurance policy #0286699 (“Policy”) issued by CNA. The Policy has remained in effect at all times since it was issued. In 1995, Trustmark assumed responsibility for claims administration and in 1996 Trustmark purchased the Policy from CNA. The Policy’s total disability benefits clause relevant to the issues in this case provides as follows:
Total disability means that because of Injury or Sickness: (1) You are Disabled from performing the substantial and material duties of Your regular occupation; and (2) You are under the regular care of a licensed physician other than Yourself; and (3) You are not gainfully employed in an occupation reasonably consistent with Your education, training and experience.
The total disability benefit to be paid under the Policy is $4450.00 monthly plus a 5% cost of living adjustment and an $850.00 monthly social security rider.
When the Policy was issued in 1986, Michael was employed by Puritan Pontiac in Hyannis, Massachusetts as a General Manager. Michael left Puritan Pontiac for a position as General Manager for Miskinis Buick/Pontiac (“Miskinis”), which had locations in Bridgewater, West Bridgewater, and Brockton, Massachusetts. Michael was employed at Miskinis as General Manager in March 1990 when the claim which is the subject of this lawsuit arose. At that time, Michael was earning approximately $75,000 annually exclusive of bonuses.
Michael’s Disability
Michael’s position at Miskinis included overseeing the operations of the parts and service departments, overseeing the entire company’s budget, and increasing sales. Michael was also responsible for the hiring and firing of employees, who numbered approximately 120 in 1989. Michael was a “hands-on” executive who prided himself on being personally acquainted with all of the company’s employees. He took an interest in each employee’s welfare and affairs and made a point of visiting and talking with the employees during the work day. Michael identified with the employees because he had worked his way up the automobile dealership hierarchy from a low level position.
By the end of 1989, Miskinis began experiencing a sharp decline in car sales. Because of the market decline and the need to maintain the profitability of the dealerships to the satisfaction of the owner, Michael, in his capacity as General Manager, was forced to lay off approximately half of Miskinis’ employees. These layoffs distressed Michael who felt that he had failed both the owner and the employees. Matters became worse around Christmas 1989, when Robert Miskinis, the owner of the dealerships, personally stated to all of the employees that there would be no further layoffs. Michael was concerned and upset by Miskinis’ statement because he knew that more layoffs would be needed and that the employees to whom he was devoted would be hurt.
It was during this period that Michael first began to suffer symptoms of depression such as insomnia, lack of concentration and energy, frequent crying, withdrawal, and loss of appetite. In March of 1990, Michael spoke with Mr. Miskinis and they both agreed that Michael would benefit from some time off. Miskinis recommended that Michael seek counseling and referred Michael to Dr. George Fournier, a clinical psychologist. Michael took a leave from his employment in late March 1990 and began treating with Dr. FoumierinApril 1990. In accordance with the Policy, Michael applied for and received total disability benefits. Those benefits were paid by CNA and Trustmark from 1990 to January 1999 when Trustmark ceased payments in a dispute with Michael over access to his treatment records.[2]
By late summer 1990, Michael was anxious to return to work. With Dr. Fournier’s approval, he returned to Miskinis in August 1990.- However, he was assigned only non-managerial tasks. After eight weeks back at Miskinis, it was clear that Michael would not be able to fulfill his responsibilities as General Manager. Michael discussed the matter with Mr. Miskinis and left Miskinis permanently in October 1990. Michael never returned to work as a General Manager or in any other executive capacity at an automobile dealership. Michael is currently self-employed as a dog trainer, an occupation which is not reasonably consistent with his education, training and experience as a general manager of an automobile dealership. As will be discussed in more detail below, Michael is now and since 1990 has been totally disabled from performing the substantial and material duties of his occupation as general manager of an auto dealership. This disability is causally related to the psychiatric illness which Michael suffered in March 1990 while employed at Miskinis.
B. Medical Treatment History
The parties do not dispute, and I so find, that Michael first became disabled in March 1990 when he left Miskinis. The cause of the disability was depression. Since the onset of his disability in 1990, Michael has been under the continuous care of physicians and other mental health providers who have provided appropriate and reasonable care. Dr. Fournier first treated Michael on April 17, 1990 and continued as his psychotherapist until October 1999. When Michael began treatment with Dr. Fournier in April 1990, he had no history of psychiatric illness or treatment. He presented to Dr. Fournier complaining of symptoms, including sleep disturbance, tearfulness, anxiety, guilt and feelings of worthlessness which occurred in the wake of the events at Miskinis in *247 late 1989. After performing a clinical evaluation applying the standards in the Diagnostic and Statistical Manual (DSM), Dr. Fournier diagnosed Michael’s condition as Major Depressive Disorder, single episode. Dr. Fournier also performed psychological testing which included the Minnesota Multiphasic Personality Inventory (MMPI). The purpose of the MMPI is to assist the psychologist in making a diagnosis and formulating a treatment plan for the patient. The test consists of 440 true-false questions. Once completed, the patient’s answers are analyzed by the psychologist, often with the aid of a computer, and are charted on various scales and sub-scales, each denoting a specific type of mental or personality disorder. There are also scales designed to evaluate the validity of the test for that patient. Validation involves measuring the truthfulness of the patient’s responses in a manner not apparent to the patient. Michael’s MMPI showed an elevated depression sub-scale, anxiety, and concerns about his bodily functions. The validity scales showed that Michael was very likely answering the questions honestly and forthrightly. These psychometric findings corroborated the diagnosis Dr. Fournier had already made on the basis of the clinical findings.
Though Dr. Fournier treated Michael on a weekly basis initially, these sessions varied from weekly to monthly without interruption over the nine years of their patient-psychotherapist relationship. In conjunction with Dr. Fournier’s psychotherapy during the early months of Michael’s treatment, Dr. Donald Reusch, Michael’s primary care physician prescribed Elavil for the depression.
One of Dr. Fournier’s early treatment goals was Michael’s return to work as a General Manager of an automobile dealership. However, the return to work strategy, which relied in part on a revised drug regimen, did not succeed in eliminating or even ameliorating Michael’s disability. In December 1990, Michael was referred to Dr. Stephen Jaffee, a psychiatrist, who prescribed various medications, including Serex, Klonopin and Pamelor. Dr. Fournier was now teamed with a psychiatrist as opposed to a primary care physician in an effort to address the lack of progress in resolving Michael’s depression. Michael continued with Dr. Jaffee until 1991, when he began treating with Dr. Jean K. Boyd, also a psychiatrist. Dr. Boyd, who continued the Pamelor and introduced Prozac, managed Michael’s drug regimen until 1994 when Michael decided to discontinue his visits with her. Even with management by a psychiatrist, the drug regimen was not as aggressive or successful as it might have been because of concerns about the side effects which included sexual dysfunction and urine retention.
In addition to overseeing Michael’s short-lived return to Miskinis in August 1990, Dr. Fournier attempted to gradually ease Michael back into the work force with volunteer opportunities at the Service Corps of Retired Executives (SCORE) and at alocal soup kitchen. In 1992, Michael began to volunteer at a food panty, a move encouraged by Dr. Fournier because of Michael’s organizational skills and ability to work well with other people. The next effort to bring Michael back to the auto sales environment involved automobile auctions. At Dr. Fournier’s suggestion, Michael attended several automobile auctions but he did not handle this exposure veiy well. The experience caused him to suffer anxiety, nervousness and elevated heart rate. Thereafter, Dr. Fournier withdrew the suggestion to attend automobile auctions and abandoned any further attempts to reintroduce Michael physically to his former work environment. Eventually, Dr. Fournier focused less on returning Michael to work than on resolving the depression and anxiety that were affecting Michael’s quality of life.
Dr. Fournier terminated the psychotherapist-patient relationship with Michael in October 1999 when he left his practice to teach full time. At that time, Dr. Fournier was seeing Michael on a monthly basis. In October 1999, Michael commenced the process of identifying a new psychotherapist who would accept Michael’s health insurance. After a delay of a few months, occasioned only by the need for time to identify a new psychotherapist, Michael began treating with Dr. Donald Steele who commenced psychotherapy sessions with Michael on April 24, 2000. Those psychotherapy sessions were ongoing at the time of trial.
After his initial encounter with Michael, Dr. Steele diagnosed major depression severe, not psychotic, confirming the diagnosis that had been made by all the other examiners since 1990. Dr. Steele also found that Michael had a significant anxiety disorder. The diagnosis was based on Michael’s reported symptoms which included sadness, hopelessness, sleep disturbances, memory loss, suicidal ideation, diminished concentration and decreased libido. Michael remained on the Zoloft that had been prescribed previously with the understanding that he could increase the dosage on particularly stressful days. Initially, Dr. Steele began treating Michael on a weekly basis, but this later changed to bimonthly meetings with periods of weekly treatment as needed.
Despite Michael’s long-standing and continuous treatment history, he presently suffers from a significant and disabling psychiatric illness as evidenced by Dr. Steele’s clinical findings as well as the expert opinion of Dr. Stuart Grassian,[3] Michael’s expert. I credit Dr. Steele’s testimony and Dr. Grassian’s testimony that Michael suffers currently from a major depression which prevents him from resuming his employment as General Manager at an automobile dealership. Michael’s particular experience with depression causes anxiety, serious cognitive impairment, poor memoiy, social withdrawal and the inability to concentrate. Together, these conditions have created insuperable physical and emotional barriers to Michael’s ability to function as a general manager or executive at an automobile dealership. *248 Though Michael is motivated to return to work as demonstrated by his efforts to overcome the depression, he simply cannot perform the duties of general manager or other executive positions so long as he is burdened with the limitations caused by his illness.
This conclusion is also supported by the most recent MMPI-2 administered in 2001 by Dr. Gary Athelstan, Trustmark’s expert.[4] The results of the 2001 MMPI-2 are similar to those of the 1990 MMPI which demonstrated that Michael was severely impaired by depression. Indeed, the scales measuring hypochondriasis, depression, hysteria, paranoia and anxiety were more elevated in 2001 than in 1990. Although Dr. Athelstan expressed distrust of the 2001 MMPI-2 results, the interpretation of the validity scale (the standard means of determining if the examinee is truthful) shows that the clinical profile is “probably valid.”
C. The Claims Process
1. Pfe-1995/CNA
Michael left his job in April 1990 and on May 8, 1990 filed his claim for benefits under the total disability provisions of the Policy. CNA allowed the claim. Michael also filed a claim for Social Security and workers’ compensation benefits.[5] At CNA’s request, Michael submitted to an Independent Medical Examination (“IME”) performed by Dr. Elizabeth Ellis in 1991, 1992 and 1993. Dr. Ellis concluded, after each examination, that Michael suffered from a Major Depression.[6] CNA approved Michael’s claim and began paying benefits in 1990. In 1993 after Michael’s claim for Social Security benefits was approved, CNA instituted an “auto-pay” procedure which required that claim forms be submitted only twice each year. In April 1993, Dr. Roy Lubit performed an IME and in a report dated April 20, concurred with Dr. Ellis that Michael suffered from depression but opined that work was not the sole cause of his depression.[7] This finding was based on the fact that Michael had not recovered, despite being away from work for two years. Dr. Lubit criticized Michael’s pharmacological treatment and expressed the opinion that Michael was only partially, not totally, disabled from the automobile business. Michael and Dr. Fournier later became aware of Dr. Lubit’s criticisms of his treatment regimen. However, neither Dr. Fournier nor the psychiatrists managing Michael’s medications took steps to change the drug therapy. Over the course of his treatment, Michael had been prescribed a variety of medications including Prozac, Pamelor, Serax, Nortiyptiline, Zoloft, Welbutrin and Paxil. Their judgment, which I find to be reasonable given all the attending circumstances, was that the active cognitive behavioral treatment and the prescribed drug regimen were appropriate for Michael. CNA, though aware of Dr. Lubit’s criticism, never took any steps to pressure Michael or his treaters to modify the drug regimen.[8]
2. Post-1995/Trustmark
In 1995, Trustmark assumed responsibility for claims administration and in 1996 assumed the Policy. Trustm-ark sent notice of this change to Michael in a letter dated September 21, 1995. That letter also requested that Michael submit a new claim form, as the last form had been received in December of 1994. On October 12, 1995, Michael submitted, as requested, a signed Continuance Claim Form (CCF) which contained pre-printed language authorizing the release of any and all treatment records.[9] Trustmark also notified Dr. Fourn-ier in a letter dated September 21, 1995 of the change in administration of the Policy and requested that Dr. Fournier release Michael’s medical records and complete a Psychiatric Questionnaire. The requested documents were not forthcoming and Trustmark subsequently called Dr. Fournier to follow up on its request for the records. Dr. Fournier stated that he would not release Michael’s records, claiming that Michael had revoked his authorization to release the records even though he had on file Michael’s signed CCF which was dated October 12, 1995. Dr. Fournier also declined to complete the Psychiatric Questionnaire unless he was paid.
In late October 1995, Trustmark contracted with Managed Health Benefits (MHB) for advice on the handling of Michael’s claim. In its report dated December 21, 1995, MHB opined that, based on the claim file, notes from Dr. Boyd, and a telephone interview with Dr. Fournier, Michael’s treatment was appropriate, but questioned the length of his disability. The basis of this concern was that most episodes of Major Depression, even when left untreated, resolve within 6-13 months, while Michael was still ill after five years of treatment. MHB also expressed misgivings about Michael’s desire to return to work (the disability insurance policy paid sufficient funds for Michael to maintain his pre morbid standard of living) and the fact that Dr. Fournier’s treatment focused on anxiety symptoms, despite a diagnosis of depression. On December 26, 1995, after reviewing this report, Trustmark authorized an IME of Michael to be conducted by a psychiatrist.
Dr. Daniel Rutrick performed the IME and prepared a report dated February 19,1996. The examination focused on Michael’s mental illness and confirmed the prior diagnosis of Major Depression. Specifically, Dr. Rutrick found a “chronic and intractable major depression which warrants aggressive psychopharmacological management.” The essence of the report was that Michael’s condition lingered on for such a long period because an aggressive drug regimen, under the supervision of a psychiatrist, had not been established. Dr. Rutrick suggested a course of therapy to be followed, citing specific medications to be taken. However, Michael’s treaters believed that the treatment was appropriate[10] and none of these suggestions were implemented.
In 1996, Trustmark renewed its efforts to gain access to Michael’s medical records from Dr. Fournier as well as from other health care providers. On three occasions, May 13, 1996, December 16, 1996, and July 16, 1997, Trustmark requested and was provided with Michael’s records from Dr. Robert Friedman, his *249 primary care physician. Trustmark also received medical records from Dr. Jean K. Boyd. These records indicated that Michael had discontinued visits for medication management in 1994.
In June 1996, Trustmark once again requested treatment notes from Dr. Fournier. Again he refused, claiming this time that the treatment notes were sensitive and privileged. Michael had signed a CCF on March 26,1996 which authorized the release of the records. Again, Dr. Fournier refused Trustmark’s request. By September 1996, Trustmark had received neither Michael’s records, nor any reports from Dr. Fournier documenting Michael’s treatment. Nonetheless, Trustmark decided to continue payment of Michael’s benefits through the end of the year while MHB followed up with Dr. Fournier on the records request. Thereafter, MHB notified Trustmark that it had contacted Dr. Fournier in writing and by telephone and that Dr. Fournier was still refusing to turn over the records. Dr. Fournier was now claiming that such a request was unusual and that the treatment notes had never been released. Even while Dr. Fournier stonewalled Trustmark, Michael signed another CCF on September 17, 1996.
In response to the inability to secure the treatment notes, MHB suggested that Trustmark conduct a private investigation and surveillance of Michael to gain information regarding his claim. Trustmark did so between November of 1996 and March 1997, but the investigation failed to uncover any useful information. Michael was never observed engaging in activities inconsistent with his claimed disability. With no information available from the surveillance, a Trustmark claims adjuster sent two letters on July 16, 1997 and on September 23, 1997 to Dr. Fournier requesting his records. Dr. Fournier failed to respond to either letter.
On October 8, 1997, Lincoln National Reassurance Company (Lincoln), the re-insurer for the Policy, suggested that Trustmark seek an interview with Michael. The purpose of this interview was to learn more about Michael’s motivation, activities and treatment goals. Trustmark agreed to seek such an interview, and while doing so, continued to pay benefits to Michael until June of 1998. By this time, Michael had hired counsel who advised him to refuse an interview on the ground that it was not called for by the express language of the policy. As an alternative to the interview, Trustm-ark agreed to submit a series of written questions to Michael. These questions addressed the same issues as the proposed interview. Once again, Michael’s counsel refused, claiming that there was no specific language requiring answers to the questions.
On June 12, 1998, Trustmark sent yet another letter to Dr. Fournier requesting copies of his treatment notes. Dr. Fournier returned the letter with a handwritten note stating that the authorization form for release of the records was not valid since it was not dated or signed. Dr. Fournier demanded that Trustm-ark send a signed, dated authorization, despite having in his possession a prior authorization which provided for the release of records as long as the claim was pending. Thereafter, on July 20, 1998, Michael submitted a CCF on which he had deleted the records release authorization. This action had the purported effect of revoking all prior authorizations and constituted a reverse in Michael’s position previously agreeing to the release of records to CNA and Trustmark.
On July 31, 1998, MHB sent to Dr. Fournier a series of questions seeking information regarding Michael’s treatment, abilities, and prognosis. Dr. Fournier did not respond to the questions.
In early August 1998, Suzanne Ney, a Trustmark supervisor, reviewed the Michael file. Her review took note of the following: (1) the recommendations from Dr. Rutrick’s IME had not been implemented; (2) Michael was refusing to submit claim forms with the records release authorization language; (3) Michael and Dr. Fournier refused to release treatment records to Trustmark; (4) Dr. Fournier refused to be interviewed over the telephone, despite participating in such discussions in the past; and (5) neither Michael nor Dr. Fournier had responded to any of the written questions sent to them. The review also revealed irregularities in the most recent claim forms. The claim forms were completed by the same person, even though input was required by the insured and the attending physician. Upon completing the full file review, Ms. Ney concluded that there was insufficient information available to justify the continuation of payments to Michael. On August 6, 1998, Trustmark advised Michael that no additional benefits would be authorized for release until he submitted an unaltered authorization form, treatment records, and interview information.
In a letter dated August 20,1998, Michael’s counsel protested Trustmark’s decision to terminate payments on the ground that the Policy did not require Michael to grant access to treatment notes. Trustmark relented and agreed to continue benefits pending the receipt of Dr. Fournier’s answers to the questions submitted to him in the July 31, 1998 letter. Trustm-ark explained its agreement to continue benefits in its letter of September 30, 1998. Trustmark acknowledged that Michael had the option under the policy to have a narrative prepared by Dr. Fournier, in lieu of providing treatment records. At the same time Trustmark stated that it reserved the right to demand Dr. Fournier’s treatment records in the event that the narrative did not answer the questions submitted, or was insufficient to establish total disability.
On November 14, 1998, Dr. Fournier submitted responses to the questions sent to him from MHB. However, Dr. Fournier refused to answer three of the questions[11] on instructions from plaintiff s counsel. Dr. Fournier’s refusal to answer the question relating to Michael’s work status was not problematic because Trustmark was frilly aware of Michael’s work status (he was neither working nor volunteering) prior to the sub *250 mission of Dr. Fournier’s answers. As to the unanswered questions regarding attempts to gear the treatment toward returning Michael to work, Trustmark had no way of knowing what Dr. Fournier was doing in treatment, especially since he had not produced his treatment notes. Trustmark was equally in the dark on the proposed solutions for returning Michael to work. Without this information Trustmark concluded that Michael had proffered sufficient information to permit a decision on total disability as defined by the Policy. To add to the confusion, Dr. Fournier’s response indicated for the first time that Michael was suffering from Post-Traumatic Stress Syndrome (PTSD).
On December 2, 1998, the handling of Michael’s claim was transferred to Mr. Frank Traina. However, the dispute over the scope of Trustmark’s right of access to medical records remained. Traina informed Michael’s counsel that benefits would be paid through December 30, 1998 but he reiterated Trustmark’s view that the burden was on Michael to prove his entitlement to benefits.[12] Traina also advised Michael’s counsel that the lack of information could result in a denial of the claim for lack of information to support a finding of total disability.
The skirmishes over the records continued into 1999. Trustmark wrote to Michael’s counsel on February 3, 1999 again requesting that Michael sign and submit, without alteration, Trustmark’s preprinted standard authorization. Trustmark also had not received records from Dr. Friedman, Michael’s primary care physician. The letter was an additional attempt to obtain these records which had been provided in the past. Still, Trustmark agreed to pay benefits through January 1999 pending receipt of the requested authorization. Michael’s counsel responded in a letter dated February 11, 1999 that “Mr. Michael will fully authorize his treating medical providers to furnish you with periodic reports as are reasonably necessary. He will under no circumstances authorize release of office and/or treatment notes.” After making the January 1999 payments as promised, Trustmark ceased paying benefits to Michael.
D. Trustmark’s Handling of Michael’s G.L.c. 93A Letter
In a letter dated April 9, 1999, Michael, through counsel, sent a demand letter to Trustmark, pursuant to G.L.c. 93A. The letter alleged that Trustmark committed unfair and deceptive acts in violation of G.L.c. 176D(9) (f) by failing to make prompt payments under the policy after liability had become reasonably clear.[13] Trustmark replied with its own letter, dated May 13, 1999, which reasserted its insistence on the production of Michael’s treatment notes from Dr. Fournier. Traina informed Michael’s counsel that a decision would be made regarding future payments under the policy. Traina noted in his letter that (1) Michael refused to submit to a personal interview, (2) Michael failed to respond to the written questions sent to him, (3) Dr. Fournier refused to be interviewed over the telephone, (4) Dr. Fournier failed to provide detailed answers to the written questions, and failed to answer three questions entirely, (5) Dr. Friedman refused to produce his office records, despite doing so in the past, and (6) plaintiffs counsel refused to allow any treatment notes to be released. Mr. Traina declared that Michael had the burden of identifying and submitting whatever information that would be helpful to Trustmark’s assessment of the claim within thirty days. Traina also indicated that after thirty days, a decision would be made on whether to continue payment on the claim regardless of Trustmark’s receipt of the requested information.
CONCLUSIONS OF LAW
Michael’s Breach of Contract Claim
Michael’s theoiy of recovery on the breach of contract claim is that Trustmark violated the terms of the Policy by demanding the office notes of his treating psychologist and terminating disability benefits in January 1999 after being refused access to those notes. Trustmark responds that it had a right to conduct a reasonable investigation into the facts and circumstances surrounding Michael’s claim for benefits and that Michael’s failure to cooperate is a defense to the breach of contract claim.
The analysis of Michael’s claim necessarily begins with the Policy which governs the rights and duties of the parties under the contract of insurance. The relevant provision of the Policy reads that." . . benefits due will be paid subject to continuing proof of loss." Simply put, the Policy requires that Trustmark pay benefits to Michael and that Michael prove his loss on a continuing basis. Trustmark’s right to conduct a reasonable investigation of the “proof of loss” and Michael’s duty to cooperate in such investigation are implied in these mutual obligations. Washington v. Metropolitan Life Ins. Co., 373 Mass. 714 (1977). The inquiiy for this court, therefore, is whether the demand for Dr. Fournier’s treatment notes was reasonable such that Michael was required to grant access to Trustmark. If Trustmark’s demand for access to Dr. Fournier’s treatment notes was reasonable, Trustmark may assert Michael’s refusal to grant access as a defense to the breach of contract claim.
Michael argues that Trustmark’s demand for the treatment notes in the circumstances of this case was unreasonable because 1) he had an absolute right to refuse to disclose Dr. Fournier’s office notes on the grounds of privilege, G.L.c. 233, §20B; 2) the Policy did not expressly require a waiver of the statutory privilege respecting patient-psychotherapist communications; and 3) Trustmark had in its possession sufficient information to support the claim for total disability benefits thereby obviating the need for access to Dr. Fournier’s treatment notes.[14] I address each of these arguments in turn.
First, G.L.c. 233, §20B does not stand as a bar to the disclosure of Dr. Fournier’s treatment notes. The statute provides in relevant part as follows:
*251 Except as hereinafter provided, in any court proceeding and in any proceeding preliminary thereto and in legislative and administrative proceedings, a patient shall have the privilege of refusing to disclose, and of preventing a witness from disclosing, any communication, wherever made, between said patient and a psychotherapist relative to the diagnosis or treatment of the patient’s mental or emotional condition.
(Emphasis supplied.) The clear intent of the statute is to create and protect the privilege in the limited circumstances involving “court proceeding and . . . any proceeding preliminary thereto and in legislative and administrative proceedings.” So defined, the privilege simply does not apply to shield patient-psychotherapist communications from scrutiny by an insurer conducting a legitimate and reasonable investigation of a claim for benefits under a policy of insurance.
Even if G.L.c. 233, §20B created a privilege in the circumstances of this case, it would not necessarily operate to bar the insurer’s access to Dr. Fournier’s treatment notes. The Supreme Judicial Court in Mello v. Hingham Mutual Fire Insurance Co., 421 Mass. 333 (1995), held that the insured could not assert the constitutional privilege against self incrimination to limit the insurer’s right to conduct a reasonable investigation of the claim. In explaining the reason for adopting this rule, the court noted that “[a] person may not seek to obtain a benefit or to turn the legal process to his advantage while claiming the privilege as a way of escaping from obligations and conditions that are normally incident to the claim he makes. This principle holds particularly where the benefit he seeks is from another private party, who is being asked to make good on its obligation forgoing the countervailing advantages that were part of the bargain.” Id. at 338. The teaching of Mello that an insured may not assert a privilege if the insurer’s demand for the information is otherwise reasonable, is no less applicable in the circumstances of this case.
At the same time, Mello does not compel a finding that Michael breached his duty of cooperation by withholding the treatment notes. The policy at issue in Mello expressly obligated the insured to submit to an examination at the request of the insurer. Such a provision which follows the statutory mandate[15] is interpreted as a condition precedent to liabiliiy. If the insured fails to comply, the insurer is not liable to pay benefits under the policy. Here, no language in the Policy obligates Michael to provide treatment notes though he may be required to do so if otherwise reasonable.
Second, Michael’s argument that Trustmark could not demand the production of privileged records without explicitly requiring disclosure in the Policy is without merit. As discussed above, the privilege created by G.L.c. 233, §20B does not apply to an insurer’s reasonable request for information as part of an investigation of the insured’s claim. Since there is no privilege, whatever duty an insurer might have to explicitly seek an advance waiver is not present here. Furthermore, Michael cites no controlling authority to support his argument on this point and I decline to adopt it.
As to Michael’s final point, I conclude that Trustmark had access to sufficient information, without the contested treatment notes, to verify Michael’s claim when it terminated benefits in January 1999. For this reason, the demand for otherwise confidential[16] records was unreasonable.
In January 1999, the claim file included marginally useful historical information[17] as well as the following: 1) the Attending Physician Statement (APS) dated July 15, 1998; 2) the Continuance Claim Form (CCF) dated July 20, 1998; and 3) Dr. Fournier’s November 14, 1998 letter. The July 15, 1998 APS submitted by Dr. Fournier indicated that Michael had participated in psychotherapy during the preceding month. However, it contained no response at all to the request for the following information: a) “Diagnosis (including complications)”; b) “Subjective symptoms”; or c) “Objective Findings.” With these key sections left blank, there was nothing in the APS to substantiate Michael’s claim of disability. The CCF, a form executed by the insured, is the formal request for disability benefits and the authorization to investigate the claim.[18] As such, this form by itself shed no light on the particular facts underlying Michael’s claim for disability benefits. Trustmark was left, therefore, with Dr. Fournier’s November 14, 1998 letter, submitted as a negotiated substitute for his office notes. On the advice of Michael’s counsel, Dr. Fournier flatly refused to address some questions and provided only conclusory answers to some of the remaining questions. Specifically, Dr. Fournier refused to answer whether Michael was currently employed and whether the past treatment included a strategy for returning Michael to work. He also refused to provide “solutions for returning Mr. Michael to work.”[19] Nonetheless, the letter offered important and relevant information about Michael’s present status including Dr. Fournier’s opinion that Michael was still suffering from a “major depressive disorder, single, severe with atypical features, without full interepisode recovery” and that his symptoms were still present. In addition, the letter identified specific obstacles to Michael’s return to work as “residual cognitive impairments, problems with affect and anxiety in response to stimuli associated with prior work functions.”
Trustmark may well have viewed Dr. Fournier’s opinion with mistrust, especially given his obstruction of the effort to gain access to his treatment notes. However, Dr. Fournier’s November 14, 1998 letter in response to Trustmark’s questions contained information reasonably suggesting the validity of the claim. The letter addressed some of the questions proposed by Trustmark, and, in the process, explained with reasonable specificity the reasons for Michael’s continued disability. These reasons were open to scrutiny and could have been verified by way of an IME or some other investigative approach. Trustmark could not *252 simply cast this information aside because it distrusted the source. If Trustmark did not wish to take the letter at face value, it retained the right to investigate the matter further. Washington v. Metropolitan Life Ins. Co., 372 Mass. at 719. Furthermore, it was not clear that Dr. Fournier’s treatment notes would answer the questions Trustmark seemed intent on answering. According to expert testimony which I credit, the treatment notes are necessarily brief and do not reflect the substance of the psychotherapy sessions. So it is not clear precisely what Trustmark expected to learn from the treatment notes. Furthermore, Trustmark was aware, through its claims representative Frank Traína, that Michael had offered to undergo an IME.[20] The availability of an IME was a reasonable alternative to the release of Dr. Fournier’s treatment notes. With access to Michael and a recitation of the basis of the disability from Michael’s psychotherapist for the eight years he had been under treatment, a qualified independent medical examiner could either confirm or refute the claim of disability.
Trustmark argues that the independent medical examination would have been useless without access to the treatment notes. However, Trustmark failed to offer sufficient evidence to support this claim. Trustmark’s expert, Dr. Athelstan, testified to his opinion that the notes were necessary as the only unbiased and uncensored source of information. However, beyond this con-clusory assertion, there was no persuasive evidence before me from which I could conclude that an independent medical examination, without the treatment notes, would be inadequate to address the issue of Michael’s disability. Trustmark offered no evidence regarding precisely what it expected to learn from the treatment notes, only that it wished to have them. Nor did it offer evidence suggesting that treatment notes follow some standard form which would reveal information relevant to its concerns. This case might be in a different posture if Trustmark had required the IME and the IME was inconclusive on the issue of Michael’s disability because of lack of access to the treatment notes. For these reasons, I conclude that Trustmark breached its contract by terminating benefits before exhausting all its options for verifying Michael’s claim of total disability.
Michael’s G.L.c. 93A Claim
In his request for findings and rulings, Michael makes three arguments in support of his claim that Trustmark violated his rights pursuant to G.L.c. 93A. He claims that Trustmark violated a) G.L.c. 176D, §3(9) (d) by refusing to pay benefits without conducting a reasonable investigation based upon all available information; b) G.L.c. 176D, §3(9) (f) by failing to effectuate a prompt, fair and equitable settlement of a claim in which liability had become reasonably clear and c) G.L.c. 176D, §3(9)(g) compelling him to institute litigation to recover benefits due to him under the disability policy by offering substantially less than the amount he ultimately recovered. The G.L.c. 93A claim letter of April 9, 1999[21] is not so specific. It refers generally to G.L.c. 176D, §3(9) in asserting Trustmark’s failure to make prompt payment as a violation of G.L.c. 93A. Trustmark argues correctly that Michael’s claim must be limited to the conduct specified in the demand letter. Entrialgo v. Twin City Dodge, Inc., 368 Mass. 812 (1975). I conclude that the letter reasonably describes the claims Michael asserts in his request for rulings under G.L.c. 176D, §3(9)(d) and that, in any event, all of the claims lack merit.[22]
First, Michael’s claim premised on G.L.c. 176D, §3(9) (d) alleging that Trustmark violated the statute by “(r]efusing to pay claims without conducting a reasonable investigation based upon all available information” is without merit. The investigation in this case was extensive and appropriate and Trustmark’s decision to terminate payments was reasonable under the circumstances known to it in January 1999.
The plain language of this section of the statute contemplates a situation where the insurer refuses to pay a claim without attempting to verify its legitimacy. Nothing like that happened here. From September 1995 to December 1998, Trustmark engaged in a long-running tug of war with Michael over access to information relative to his claim. Michael grudgingly provided information which was at times contradictory and incomplete. Yet Trustmark continued to pay benefits while it investigated the claim. Taking stock of the full history of the relationship between Trustmark and Michael, it can hardly be said that Trustmark failed to conduct a reasonable investigation before it terminated payments to Michael. See Jacobs v. Arlington, 402 Mass. 824 (1988).
Trustmark’s decision to terminate payments based on the information known to it as a result of the three-year effort to secure Michael’s cooperation with its investigation was entirely appropriate and untainted by bad faith or the kind of “unethical or unscrupulous” conduct typically associated with G.L.c. 93A liability. See Wasserman v. Agnastopoulos, 22 Mass.App.Ct. 672, 679 (1986). Michael suggests that Trustmark’s sole purpose in demanding the treatment notes was to avoid its obligation to pay benefits due to him under the Policy. I do not adopt the suggestion that Trustmark had an ulterior motive in demanding the treatment notes. First, the circumstances surrounding the claim provided sufficient reasons for Trustmark’s attention to Michael’s claim. In 1995, when Trustmark made its initial demand for office notes, Michael had been out on disability for five years, even though his treating psychologist had opined that his disability would last no more than a year. In addition, other circumstances converged to cast suspicion on Michael’s claim of total disability. Dr. Fournier, the treating psychologist, refused Trustmark access to his office notes claiming that he lacked authorization to provide the notes. This response was disingenuous because Michael had signed a release granting Trustmark access to any information Trustmark might deem relevant to the claim. Also, although Dr. Fournier had never *253 provided his treatment notes, other providers, namely Dr. Friedman, had produced office notes without protest in the past. While stonewalling Trustmark’s access to the office notes, Michael also blocked Trustmark’s efforts to gain access to information from other sources. Though Michael may not have had any reason to be evasive, his conduct certainly raised red flags that Trustmark was warranted in heeding. Trustmark did not move precipitously to terminate Michael’s benefits. The dispute over access to Dr. Fournier’s treatment notes continued without resolution for almost four years before Trustmark eventually terminated the benefits. In these circumstances, Trustmark could properly question Michael’s claim and terminate payment without having to defend its motives.
Michael claims that Trustmark violated G.L.c. 176D, §3(9)(f) by “failing to effectuate a prompt fair and equitable settlement of a claim on which liability had become reasonably clear.” The claim letter did not put Trustmark on notice that Michael was aggrieved by a failure to “settle” his claim. The letter referred only to Trustmark’s failure make “payment” on his claim. “There is a difference between making a payment on a claim and settlement of a claim. General Laws c. 176D, §3(9) recognizes that difference. Clause (d) concerns refusing to pay claims without conducting a reasonable investigation. Clause (j) refers to ‘making claims payments.’ On the other hand, clauses (f), (h), (i), (k) and (m) refer to ‘settlements,’ ‘settle a claim’ or the like.” Lazaris v. Metropolitan Property and Casualty Insurance Company, 428 Mass. 502, 505 (1998). It follows that the claim letter must state with particularity whether the alleged unlawful conduct involves the “payment” of a claim or the failure to “settle” a claim. Nothing in the letter suggests that Michael’s complaint relates to the failure to “settle” his claim as that term is understood in the law. For this reason, I decline to adopt Michael’s proposed conclusions of law on the claim pursuant to G.L.c. 176D, §3(9)(f).
Finally, I address Michael’s claim based on G.L.c. 176D(3)(9)(g) alleging that Trustmark violated the statute by “compelling [him] to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by such insureds.” This section of the statute “expresses] a legislative purpose to penalize the practice of ‘low balling,’ i.e., offering much less than a case is worth in a situation where liability is either clear or highly likely.” Guity v. Commerce Insurance Co., 36 Mass.App.Ct. 339 (1993) It does not apply in the circumstances of this case where no offer of settlement was made.
For all of the above reasons, I conclude that Michael’s claim brought under G.L.c. 93A is without merit.
Trustmark’s Counterclaim
Trustmark argues that Michael has not been disabled since at least 1995 and that it is entitled to recover the benefits paid to Michael since that time. The weight of the evidence is contrary to Trustmark’s position and I conclude that the counterclaim for recovery of benefits paid to Michael is without merit.
As set forth above, total disability under the Policy means that Michael is unable to perform the substantial and material duties of his regular occupation; 2) Michael is not gainfully employed in any occupation consistent with his education, training and experience; and 3) Michael is receiving regular medical care appropriate for his condition. Trustmark argues that Michael was not disabled because he was in fact able to perform the substantial and material duties of his regular occupation and he was not receiving regular medical care consistent with his condition.
The facts establish that Michael is presently and has been since 1990 disabled from his regular occupation as a general manager or executive of a car dealership. In this regard, I have credited the testimony of Dr. Fournier, Dr. Steele and the expert opinion of Dr. Grassian that Michael presently suffers from a major depression and that the effects of his illness preclude him from performing the essential duties of his regular occupation. Moreover, the results of the MMPI-2 conducted by Trustmark’s expert, Dr. Athelstan are consistent with this conclusion insofar as it confirms the diagnosis of major depression.
Trustmark argued at trial that Michael’s disability from his regular occupation as a general manager of an automobile dealership means also that he cannot work in any field and that his work as a dog trainer proves that he is not disabled under the Policy. I am persuaded that Michael’s current employment as a dog trainer involving animals rather than people and requiring no executive decision making is light years away from the anxiety-provoking world of automobile dealerships and the attendant pressure to produce sales or perish.
Trustmark also argues that Michael was not totally disabled because he was not receiving regular care appropriate for his condition. The facts establish and I conclude that Michael was at all times under the regular care of psychologists, either Dr. Fournier or Dr. Steele and that the treatment was appropriate. See Lustenberger v. Boston Casualty Company, 300 Mass. 130, 137 (1938). Trustmark claims that Dr. Fournier’s treatment records fail to document any treatment during the period from April 1995 to September 1995 and that the records show only two visits in 1996. However, the facts established through Dr. Fournier’s testimony are that certain treatment records were lost or misplaced but that the treatment meetings were documented in his personal calendar and that no lapse in treatment occurred. As to the appropriateness of the treatment, Trustmark argues that Dr. Fournier improperly focused on alleviating Michael’s symptoms rather than returning him to work. Over the course of the time during which Trustmark paid disability benefits, various IMEs criticized the adequacy of Michael’s treatment. However none of the IMEs sug *254 gested that the treatment was inappropriate. For all these reasons, I conclude that Michael is presently and since 1990 has been totally disabled and that as a result, Trastmark’s counterclaim fails.
ORDER
For the reasons stated above, I enter the following order for judgment. Judgment shall enter for Michael on Count I, the breach of contract claim against Trustmark. Judgment shall enter for Trustmark on Count II, the claim brought under G.L.c. 93A. Judgment shall enter for Michael on Count Trustmark’s counterclaim.

During this period, Michael received benefits as follows: 1990-1991, $52,800; 1991-1992, $55,440; 1992-1993, $58,212; 1993-1994, $61,122; 1994-1995, $64,178; 1995-1996, $66,744; 1997-1998, $74,292; and 1998-1999, $74,760.

I credit Dr. Grassian’s diagnosis of “major depression, single episode, chronic unremitting, not psychotic.

Dr. Gary Athelstan is a specialist in rehabilitation psychology. His expert qualifications include his twenty-five year tenure as a professor at the University of Minnesota Medical School in the Department of Rehabilitation Medicine. He was retained by Trustmark to provide an expert opinion on whether Michael’s treatment was appropriate and whether the file contained sufficient information to determine the issue of disability. Ultimately, Dr. Athelstan opined that Dr. Fournier’s treatment was “appropriate but not adequate.”

The workers’ compensation benefits were denied initially. However, in 1992, the Department of Industrial Accidents allowed Michael to collect workers’ compensation benefits.

The IMEs conducted in 1992 and 1993 affirmed the diagnosis of major depression but concluded that the illness was in “partial remission.”

Dr. Lubit performed an IME again in 1995 reaching the same conclusions as in the April 20, 1993 report.

During its administration of the Policy, Trustmark also became aware of criticisms of Michael's treatment. On October 8, 1997, Lincoln National Reassurance Company, the Policy’s reinsurer wrote to Trustmark that while “it appears the claimant’s (Michael) treatment, while not very effective to date, is within the range of current practice.”

The October 12, 1995 Continuance Claim Form states in relevant part: “I authorize any medical professional, psychologist ... to give any information or record it has of me, my physical or mental health to Trustmark Insurance Company ... or its authorized representative. This shall include but not be limited to, information regarding any medical or health history including all consultation, diagnosis, prescriptions, treatments, tests, as well as any information regarding alcohol or drug abuse. In addition I authorize my employer, former employer, insurance company or insurance support organization to give any information or record it has about me, my employment, employment history and income earnings to the Company. I understand that this information will be used to determine my eligibility for benefits and may be reviewed by claims, underwriting, legal or other Company personnel. . . This authorization shall be valid as long as I have a claim for benefits with the Company. I have read and understand this authorization. I know that I may request and receive a copy of it. A photocopy of the authorization shall be valid as the original.”

See FN 8. Although Lincoln opined that Michael’s treatment was not “adequate,” it nonetheless acknowledged that it was “within the range of current practice.”

Those questions are: “8. Michael was employed as a General manager, a position that employs multiple skills and abilities. Is he currently employed? Is he currently volunteering?” “10. Has there been any attempt in the treatment process to encourage Michael to return to work? If yes, please describe these attempts. If no, please explain the rationale.” “14. Please provide some solutions for returning Michael to work (i.e., vocational issues).”

Trustmark confirmed its intent to pay benefits through December 30, 1998 in a letter dated December 3, 1998. This letter was in response to a complaint Michael filed with the Division of Insurance regarding late payment of benefits. Trustmark admitted late payment on 4 occasions but claimed that it was caused by administrative problems.

Although the letter referred to Trustmark’s failure to make “prompt payments,” I interpret the letter as basing the G.L.c. 93A claim on Trustmark’s termination of the disability payments.

Michael also asserts other grounds which I do not discuss in any detail because they are patently untenable under the law. First, he argues that Trustmark’s investigation was unreasonable because it did not comport with its own “underwriting standards.” I am compelled to reject this conclusion because Michael offered nothing to establish the content of these “underwriting standards.” Second, Michael argues that G.L.c. 1751, §4 and §6 prohibit Trustmark from collecting or receiving private information about its policyholders without informing the policyholder and seeking his authorization. This assertion is plainly wrong because the cited sections of the statute do not apply to claims investigations. Third, Michael argues that Trustmark was prohibited from demanding a personal interview pursuant to G.L.c. 1751, §3. Again, this is a misstatement of the law which prohibits only “pretext” interviews or interviews by any person making false representations of his identity or purpose.

See e.g., G.L.c. 175, §99 which provides that “as often as may be reasonably required” by the insurer the “insured . . . shall . . . submit to examinations under oath.” See also G.L.c. 90, §34M. A party must “do all things necessary to enable the insurer to obtain medical reports and other needed information to assist in determining the amounts due.”

See G.L.c. 112, §129A which provides that such records are confidential. While the statute does not create a privilege, it recognizes the need to protect the confidentiality of records insofar as possible.

The historical information, such as the prior IMEs and Dr. Fournier’s attending physician statements, was marginally useful because it did not establish Michael’s present condition.

I note that in the July 20, 1998 CCF, Michael struck out the authorization to review records.

See footnote 11.

This was not a concession inasmuch as the Policy explicitly required Michael to submit to an IME at Trustmark’s request.

The G.L.c. 93A letter asserted only a claim against Trustmark based on the “failure to make prompt payment.”

Michael gains no advantage from the ruling in his favor on the breach of contract claim. Recovery on the contract claim does not require a finding for him on the claim brought pursuant to G.L.c. 93A. Atkinson v. Rosenthal, 33 Mass.App.Ct. 219, 226 (1992) (breach of contract gives rise to G.L.c. 93A liability in circumstances where the conduct involves a “consistent pattern of the use of breach of contract as a lever to obtain advantage for the party committing the breach in relation to the other party ...”).