AMERICO MELLO & another[1] *vs.* HINGHAM MUTUAL FIRE
INSURANCE COMPANY.

Essex. October 2, 1995. - November 10, 1995.

Present: LIACOS, C.J., ABRAMS, LYNCH, GREANEY, & FRIED, JJ.

*Insurance*, Fire, Notice, Cancellation. *Constitutional Law*, Self-incrimination. *Contract*, Insurance, Performance and breach.

Discussion of the duty of an insured under a policy of insurance to cooperate with the insurer when claiming a loss. [336-337]

An insured's failure to submit to an examination under oath as required by the insurance policy in question and by G. L. c. 175, § 99, Twelfth, constituted a material breach of the policy barring recovery under the policy for a fire loss and the insured was not entitled to assert his privilege against self-incrimination to excuse or delay his compliance with the policy's statement under oath clause. [337-342]

There was no support in the record of a civil action for the plaintiff's assertion that the defendant insurer's demand for the plaintiff's compliance with the statement under oath clause of the policy in question was improper or unreasonable. [342-343]

There was no merit to the claim of an insured that the insurer had materially breached the policy in question by improperly cancelling it. [343]

CIVIL ACTION commenced in the Superior Court Department on April 26, 1994.

The case was heard by *Elizabeth B. Donovan*, J., on a motion for summary judgment.

The Supreme Judicial Court granted an application for direct appellate review.

*George L. Bernstein* for the plaintiffs.
*Ethan Warren* for the defendant.

---

[1]Maria Mello. Unless otherwise specified, references to "the plaintiff" are to Americo Mello.

FRIED, J. The plaintiffs, Americo and Maria Mello, commenced this action against Hingham Mutual Fire Insurance Company (Hingham) in the Superior Court on April 26, 1994, to recover policy proceeds for fire loss. Hingham moved for summary judgment alleging that Americo Mello's failure to submit to an examination under oath, as required both by the policy and G. L. c. 175, § 99, Twelfth (1994 ed.), constituted a material breach of the fire insurance policy, thus barring recovery under the policy. The plaintiff asserted that his refusal to submit to the examination was justified because he had become the subject of a criminal investigation for arson in connection with this fire. The plaintiff contends that the privilege against self-incrimination as protected by art. 12 of the Declaration of Rights of the Massachusetts Constitution and the Fifth Amendment to the United States Constitution justifies his refusal to submit to such an examination.

On October 27, 1994, a Superior Court judge granted Hingham's motion for summary judgment. The plaintiffs have appealed. We granted their application for direct appellate review.

I.

The record on which the Superior Court judge granted summary judgment reveals the following facts. Hingham issued a policy to the plaintiffs effective September 4, 1992, insuring their residence. On September 25, 1992, a fire of undetermined origin broke out in the plaintiffs' residence. On that day, Hingham received oral notice of loss and commenced an investigation. In addition, the Danvers police and the Massachusetts State police began investigations into what they deemed a suspicious fire. The law enforcement authorities immediately informed Hingham that the plaintiff was a suspect in their respective investigations. Four days later, Hingham sent the plaintiffs notice of the cancellation of their policy, effective October 9, 1992.[2]

_____

[2]The policy authorized Hingham's cancellation of the plaintiffs' policy. Such cancellation, however, merely terminated the parties' relationship

Pursuant to its investigation, on November 10, 1992, Hingham requested that plaintiff submit to an examination under oath, as required by the policy.[3] He initially agreed to an examination. The plaintiff, however, postponed the examination on two occasions: the first to accommodate his attorney and the second to allow him the opportunity to retain a criminal attorney. On February 23, 1993, Hingham requested that the plaintiff submit to an examination within thirty days. His attorney responded by asking why such an examination was necessary. Hingham, by letter, explained that it required the sworn statement to complete its investigation and determine whether to pay the claim. The plaintiff's attorney responded on March 22, 1993, by asserting the plaintiff's constitutional privilege against self-incrimination.

On March 29, 1993, Hingham demanded that the examination take place before April 30, 1993. The plaintiff declined. On May 3, 1993, Hingham denied coverage for the fire loss.

## II.

The plaintiffs raise two issues on appeal. First, the plaintiffs contend that, because the plaintiff was a subject of an on-going criminal investigation concerning the fire, his privilege against self-incrimination, as guaranteed by art. 12 and the Fifth Amendment, excused him from providing a statement under oath to Hingham as required by the insurance policy concerning the circumstances surrounding the fire.

_____

prospectively and did not affect Hingham's liability to the plaintiffs for the past fire loss.

[3]Although the policy is not part of the summary judgment record, the parties agree that the policy states: "Section I - CONDITIONS. 2. Your Duties After Loss. . . . f. We may reasonably require you to: . . . (3) submit to an examination under oath, while not in the presence of any other insured, and sign the same." This requirement is commonly referred to as the "statement under oath clause," and it has appeared in all standard form Massachusetts homeowners insurance policies since March, 1982, pursuant to G. L. c. 175, § 99. See St. 1981, c. 718, § 2, amending G. L. c. 175, § 99, Twelfth. According to the judge's memorandum, the policy further states that "[n]o action can be brought against [the insurer] unless there has been compliance with the policy provisions."

Second, the plaintiffs suggest that prior to the refusal to submit to the statement under oath, Hingham had materially breached the policy by improperly cancelling it.

### A.

General Laws c. 175, § 99 (1994 ed.), prescribes a statutory form for fire insurance policies. The statute sets out the insured's duty to cooperate in two sentences reprinted in the margin.[4] Prior to our decision in *Johnson Controls, Inc.* v. *Bowes*, 381 Mass. 278 (1980), the satisfaction of the insured's duties embodied in this cooperation clause was a condition precedent to the insurer's liability under the policy. Thus, the insured's failure to provide notice of loss or a sworn statement of loss within the time period allotted in the policy released the insurer from its obligations under the contract. See, e.g., *Romanos* v. *Home Ins. Co.*, 355 Mass. 499, 501-502 (1969); *Rose* v. *Regan*, 344 Mass. 223, 226 (1962).

In 1980, our decision in *Johnson Controls, Inc.* v. *Bowes*, *supra*, "modified the common law in this area by adding prejudice requirements in the contexts of notice provisions." *Darcy* v. *Hartford Ins. Co.*, 407 Mass. 481, 489 (1990). We reasoned that the notice provision of insurance policies should no longer be strictly construed as a condition precedent to the insurer's liability. *Johnson Controls, Inc.* v. *Bowes*, *supra* at 282. Instead, the insurer must establish "both that the notice provision was in fact breached and that the breach resulted in prejudice to its position," for its obli-

---

[4]"The insured shall give immediate written notice to [the insurer] of any loss . . . furnish a complete inventory of the destroyed and damaged property, . . . and the insured shall forthwith render to [the insurer] a signed, sworn statement in proof of loss which sets forth to the best knowledge and belief of the insured the following: the time and cause of the loss, the interest of the insured and of all others in the property, the actual cash value of each item thereof and the amount of loss thereto . . . . The insured, as often as may be reasonably required, shall exhibit to any person designated by [the insurer] all that remains of any property herein described, and submit to examinations under oath by any person named by [the insured], and subscribe the same; and, as often as may be reasonably required, shall produce for examination all books of account, bills, invoices . . . at such reasonable time and place as may be designated by [the insurer] . . . ." G. L. c. 175, § 99, Twelfth (1994 ed.).

gations to be discharged. *Id.* See *Darcy* v. *Hartford Ins. Co.*, *supra* at 490-491.

Our decision in *Johnson Controls*, however, affected only the notice provisions of the G. L. c. 175, § 99 duty to cooperate. The second sentence of the statutory provision addresses the insured's responsibilities during the investigation: "as often as may be reasonably required" by the insurer, the "insured . . . shall . . . submit to examinations under oath." The statute contemplates that the insurer, when it determines that an examination is reasonable, may require that the insured submit to such an examination under oath.

It is the law in most jurisdictions that the submission to an examination, if the request is reasonable, is strictly construed as a condition precedent to the insurer's liability. See 13A G. Couch, Insurance § 49A:361 (2d ed. 1982 & Supp. 1994); 5A J.A. Appleman & J. Appleman, Insurance Law and Practice § 3549 (1970 & Supp. 1994). See also *Pervis* v. *State Farm Fire & Casualty Co.*, 901 F.2d 944, 946-947 (11th Cir.), cert. denied, 498 U.S. 899 (1990); *Allstate Ins. Co.* v. *Longwell*, 735 F. Supp. 1187, 1193-1195 (S.D.N.Y. 1990); *Standard Mut. Ins. Co.* v. *Boyd*, 452 N.E.2d 1074, 1077 (Ind. Ct. App. 1983), and cases cited. This court agrees with these authorities.[5] In this case, Hingham's request was reasonable, and refusal to submit to an examination may have significantly hampered its ability to investigate the fire and assure itself that the plaintiff had not set the fire. The notification from the Danvers and State police that the plaintiff was being investigated on suspicion of arson understandably raised that concern for Hingham. Therefore, unless the privilege against self-incrimination excuses the plaintiff's failure to comply with Hingham's request, by refusing to submit to its reasonable request for an examination under oath, the plaintiff materially breached the insurance contract, releasing Hingham from its obligations.

---

[5]The plaintiffs in their appeal do not contest the premise that the refusal to submit to an examination under oath, absent their concerns about self-incrimination, would be a material breach of the insurance contract discharging Hingham from liability.

The plaintiff, though, asserts that the privilege against self-incrimination excuses his compliance with the statement under oath clause. The privilege is contained in art. 12 and the Fifth Amendment. Article 12 provides that "[n]o subject shall . . . be compelled to accuse, or furnish evidence against himself . . . ." The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." One who invokes the privilege cannot be penalized for that assertion lest the penalty create an impermissible compulsion to testify. See, e.g., G. L. c. 233, § 20, Third (1994 ed.) (failure of defendant to take the stand "shall not create any presumption against him"); *Commonwealth* v. *Smith*, 387 Mass. 900, 908-909 (1982) (impermissible to argue to jury that they should draw adverse inferences from defendant's invocation of his privilege against self-incrimination). "Yet not every undesirable consequence which may flow from the exercise of the privilege against self-incrimination can be characterized as a penalty." *Flint* v. *Mullen*, 499 F.2d 100, 104 (1st Cir.), cert. denied, 419 U.S. 1026 (1974), quoted in *Wansong* v. *Wansong*, 395 Mass. 154, 157-158, cert. denied, 474 U.S. 1014 (1985). See also *Opinion of the Justices*, 412 Mass. 1201, 1208 n.6 (1992) (recognizing that some measure of compulsion to provide incriminating evidence is permitted without offending the privilege against self-incrimination).

A person may not seek to obtain a benefit or to turn the legal process to his advantage while claiming the privilege as a way of escaping from obligations and conditions that are normally incident to the claim he makes. This principle holds true particularly where the benefit he seeks is from another private party, who is being asked to make good on its obligation forgoing the countervailing advantages that were part of the bargain. See, e.g., *Matter of Kenney*, 399 Mass. 431, 437-442 (1987) (upholding enforcement of a subpoena requiring attorney to produce possibly incriminating "required records"); *Wansong* v. *Wansong*, *supra* (upholding discovery sanction against party in a divorce proceeding who invoked his privilege against self-incrimination as to questions about

relationship with another woman); *United States Trust Co.* v. *Herriott*, 10 Mass. App. Ct. 313, 316-320 (1980) (denial of continuance in civil case where defendant subject to a simultaneous State grand jury investigation in New York). The principle holds true even where the State is also a party to the transaction. In seeking a license, applying for a position, claiming a benefit or even an entitlement, it has never been imagined that a citizen may at one and the same time make a demand on the government and refuse to supply the information that would authenticate it. See, e.g., *Department of Revenue* v. *B.P.*, 412 Mass. 1015, 1016 (1992) (compelling putative father in paternity action to submit to testing or be subject to sanctions did not violate privilege); *Custody of Two Minors*, 396 Mass. 610, 616-617 (1986) (permitting trial judge to draw negative inferences from parents' refusal to testify in a care and protection proceeding); *Stornanti* v. *Commonwealth*, 389 Mass. 518, 521-527 (1983) (upholding a civil contempt order for failure to produce possibly incriminating "required records" where creator of the records voluntarily participated in Medicaid program). Even in the situation where the State seeks to compel speech, this court has held that the privilege does not insulate a claimant from being adversely impacted by a decision to remain silent, although the resulting evidence may not itself be introduced in evidence in a subsequent criminal proceeding. See, e.g., *Opinion of the Justices, supra* at 1208 n.6 (upholding 120-day suspension of driver's license for refusal to take breathalyzer test); *Broderick* v. *Police Comm'r of Boston*, 368 Mass. 33, 37-44 (1975), cert. denied, 423 U.S. 1048 (1976) (upholding use of questionnaire that invited potentially incriminating answers where refusal to answer resulted in dismissal from employment).

Indeed, even in the criminal process, a defendant cannot turn the legal process to his advantage by asserting this privilege. See, e.g., *Blaisdell* v. *Commonwealth*, 372 Mass. 753, 766 (1977) (where defendant voluntarily submits to psychiatric examination and offers those results at trial, he cannot, by asserting his privilege against self-incrimination, refuse to

undergo a court-ordered psychiatric examination). A defendant may not seek to avail himself of his constitutional right to testify in his own behalf in order to offer, for instance, an alibi that only he could know of, without at the same time losing the protection of the privilege and opening himself to cross-examination. See *Jones* v. *Commonwealth*, 327 Mass. 491, 493-494 (1951); P. J. Liacos, Massachusetts Evidence § 13.13.5, at 799 (6th ed. 1994).

With this as background we turn to the plaintiffs' claim. They argue that the Superior Court's allowance of Hingham's motion for summary judgment imposed an impermissible penalty upon the plaintiff for asserting his privilege against self-incrimination. We disagree. Where the undesirable consequences arise from the claimant's own voluntary actions, the privilege against self-incrimination cannot be used to extricate the claimant from such a dilemma of his own making. The plaintiff voluntarily entered into the contract with Hingham, another private party. Hingham obligated itself to perform duties, some of which were contingent on the plaintiffs' actions. The plaintiffs made a claim against Hingham for coverage, and Hingham asks that the plaintiff keep his part of the bargain even if it may harm his interests in the criminal investigation. A dilemma this may be, but it is not of Hingham's or the Commonwealth's making anymore than it is a dilemma of the Commonwealth's making when an accused must choose between forfeiting the opportunity to speak in his own behalf and subjecting himself to cross-examination. Thus, it is not by the Commonwealth or by Hingham that the plaintiff "is compelled to . . . furnish evidence against himself," but by his own contractual undertaking.[6] Therefore, we hold that the grant of summary judg-

---

[6]We attach no significance to the fact that the obligation is imposed as a statutorily prescribed term in a standard policy. This is but a statutory restatement and formalization (in so far as an oath is required) of the general obligation of insureds in many kinds of contracts of insurance to cooperate with the insurer in the investigation and verification of the claim.

ment by the Superior Court is a permissible consequence of the plaintiff's assertion of the privilege.[7]

### B.

The plaintiffs seek to blunt the force of this argument by two narrower suggestions. First, they propose that the insurer might have waited until the completion of the criminal proceedings — which, after all, did result in a verdict of acquittal in the arson prosecution — before requiring the plaintiff to respond under oath to the insurer's inquiries. This is only a less extreme version of the plaintiffs' principal contention that the insurer's contractual right to the insured's full cooperation must yield to the insured's concerns about self-incrimination. The insurer's contractual right is to determine promptly — while the evidence and memories are still fresh — the validity of any loss for which it might become liable. The insurer is under a corresponding duty to pay any claim promptly, and if it is later found to have inappropriately delayed or withheld payment, it may significantly increase its own liability. See G. L. c. 176D, § 3 (9) (1994 ed.) (prohibiting unfair or deceptive acts or practices in the business of insurance); G. L. c. 93A, § 9 (1994 ed.) (civil cause of action for persons injured as a result of a c. 176D violation with the possibility of recovering trebled damages and attorney's

---

[7]Although the issue is one of first impression under G. L. c. 175, § 99, with two exceptions, every jurisdiction with a statute like our own holds the insured to his obligation, just as the judge below has done — and the two exceptions only allow the insured to postpone his obligation, an option we discuss below. See, e.g., *United States Fidelity & Guar. Co.* v. *Wigginton*, 964 F.2d 487 (5th Cir. 1992); *Pervis* v. *State Farm Fire & Casualty Co.*, 901 F.2d 944 (11th Cir.), cert. denied, 498 U.S. 899 (1990); *Saucier* v. *United States Fidelity & Guar. Co.*, 765 F. Supp. 334 (S.D. Miss. 1991); *Kisting* v. *Westchester Fire Ins. Co.*, 290 F. Supp. 141 (W.D. Wis. 1968), aff'd, 416 F.2d 967 (7th Cir. 1969); *Warrilow* v. *Superior Court*, 142 Ariz. 250 (Ct. App. 1984); *Hickman* v. *London Assur. Corp.*, 184 Cal. 524 (1920); *Restina* v. *Aetna Casualty & Sur. Co.*, 61 Misc. 2d 574, 578 (N.Y. Sup. Ct. 1969). For cases stating the exception, see *Knight* v. *Firemen's Ins. Co.*, 227 Mo. App. 426, 432 (1932); *Agricultural Ins. Co.* v. *Inglehart*, 386 P.2d 145, 147-148 (Okla. 1963). This is not surprising, for if the plaintiff's contention were valid, it would cut a broad swath through the law of fire insurance and of insurance law generally, if not well beyond.

fees). See also *Jacobs* v. *Town Clerk of Arlington*, 402 Mass.
824, 828-829 (1988); *Van Dyke* v. *St. Paul Fire & Marine
Ins. Co.*, 388 Mass. 671, 675-678 (1983). In these circum-
stances, the insurer should not have to delay its investigation
for an indeterminate and possibly lengthy period to comport
with the interests of the insured.

Second, it has been suggested that the plaintiff's concerns
could have been accommodated if the insurer had been con-
tent to question only Mrs. Mello under oath, since she had
not been told that she was under criminal investigation. Our
response to this contention is similar to the one above. The
insurer is contractually bound to both the plaintiffs and con-
tractually entitled to pursue its investigation by requesting an
inquiry of either. It was free to choose whomever or both of
the insureds it believed could assist in that investigation.

Finally, the plaintiffs complain that the insurer and the
law enforcement authorities were working "hand-in-glove,"
suggesting that the insurer's demand under the statute and
the policy was a mere pretext for assisting law enforcement
authorities with their investigation.[8] The record and the
plaintiffs' allegations go no further, however, than to show
that the law enforcement authorities and the insurer were
aware of each other's investigations and were keeping each
other informed of their respective progress. Indeed, there is
no support in the record for a suggestion that Hingham was
doing anything other than acting reasonably to protect its in-
terests. The insurer, like any citizen who has information rel-
evant to an on-going criminal investigation, has the right
(unless there exists a confidential or other special relation-
ship) and sometimes the duty to give law enforcement au-
thorities any information that may be of assistance. If that is
all the plaintiffs are complaining about, giving any weight to
their complaint on this score would have the unacceptable
entailment that the insurer, by pursuing its contractual right,

---

[8]General Laws c. 148, § 32 (1994 ed.), authorizes the sharing of infor-
mation between fire marshals, fire and police departments and insurance
companies.

would be disabled from cooperating with law enforcement authorities in ways open to any other citizen.

### III.

As an alternative basis for reversal of the Superior Court's order, the plaintiffs suggest that Hingham, by its cancellation of the policy, was the first to breach materially the insurance contract. General Laws c. 175, § 99, and the policy, however, authorize Hingham's cancellation of the policy. The policy, adopting the language of the statute, states: "When this policy has been in effect for less than 60 days we may cancel for any reason, other than nonpayment of premium, by notifying you at least 5 days before the date of cancellation takes effect." The policy also prescribes the method for delivery and form of the notice.

Hingham complied with the requirements of the policy and the statute. The policy period commenced on September 4, 1992. Hingham sent notice of cancellation on September 29, 1992, to be effective on October 9, 1992. At that time, Hingham also refunded the excess premium paid by the plaintiffs as required by the statute. See G. L. c. 175, § 99, Twelfth. Therefore, Hingham's cancellation of the policy was not a breach, material or otherwise, of the policy's provisions.

### IV.

For the reasons stated in this opinion, the Superior Court's order granting summary judgment for Hingham is affirmed.

*So ordered.*