van Gestel, Allan, J.
This matter is before the Court on the following motions: (1) Motion for Reconsideration of Defendants’ Motion for Letter Rogatory to Depose Robert Bittner, P.E., in California (Paper #18); (2) Plaintiffs Emergency Motion for Protective Order (Paper #21); (3) Defendants’ Motion to Strike Expert Testimony of Marvin Milton and to Preclude His Testimony (Paper #25); (4) Modem Continental Construction Co., Inc.’s Motion to Compel Return of Inadvertently Produced Mediation Materials and Seeking Order Declaring that Mediation Materials Are Inadmissible as Evidence (Paper #27); (5) Plaintiffs Motion to Strike Defendants’ Motion for Summary Judgment (Paper #32A); (6) Plaintiffs Emergency Motion for Further Protective Order and Other Relief (Paper #33); (7) Defendants’ Motion for Summary Judgment (Paper #35); (8) Plaintiffs Motion to Compel Defendants’ Further Production of Documents and Further Rule 30(b) (6) Deposition Testimony and for an Award of Costs (Paper #39); (9) Modem Continental Construction Co., Inc.’s Motion to Compel Production of Witnesses (Paper #40); and (10) Defendants’ Motion to Strike Improper Assertions from Plaintiffs Rule 9A(b)(5) Response, to Deem Uncontroverted Facts as Admitted, and Response to Additional Facts Set Forth Therein (Paper #43).
All of these motions were filed between August, 19, 2005, and October 19, 2005, and oral argument was heard on October 20, 2005.[1]

BACKGROUND

These background facts are taken principally from the summary judgment filings, although there are, as must be expected from the number of motions and supporting papers involved, many overlapping, generally consistent, statements in other papers as well. Not all undisputed facts are necessarily set out in this background section. Additional facts may be added in discussing particular aspects of specific motions.
In this litigation, the plaintiff, Modern Continental Construction Company, Inc. (“Modern”), contends that it is entitled to insurance coverage under a builders risk policy (the “Policy”) for the costs it incurred to repair leaks discovered during the construction of the Fort Point Channel Tunnel, a part of the Central Artery/Tunnel Project (the “CA/T Project”), often referred to as the “Big Dig.”
The defendants Zurich American Insurance Company (“Zurich”) and ACE American Insurance Company (“ACE”) are the Insurers on the Policy.
The “Insured” on the Policy is defined as “Massachusetts Highway Department, Massachusetts Turnpike Authority and/or Bechtel/Parsons Brinckerhoff.” Additional Insureds “shall be all Contractors and/or Sub-Contractors involved in the Contract Works, as their interests may appear.”
*115 Modern is an additional Insured.
The Contract Works for these purposes is, essentially, the Fort Point Channel Tunnel construction part of the CA/T Project.
The Policy contains a condition stating:
The due observance and fulfillment of the terms and conditions of this Policy and its Underlying Declarations Pages by the Insured, insofar as they relate to anything done or complied with by them, shall be a condition precedent to any liability of the [Insurers] to make payment for loss under this Policy.
The Policy further states:
This Policy and its Underlying Declaration Pages shall be void if the Insured (as defined in Paragraph 1. Page 1.) has concealed or misrepresented any material fact or circumstances concerning this insurance or the subject thereof or in case of any fraud, attempted fraud or false swearing by the Insured touching any matter relating to this insurance or the subject thereof, whether before or after a loss.
The Policy excludes “the cost of making good an error, omission or design deficiency in designs, plans or specifications, unless direct physical loss or damage by a peril insured ensues and then this policy will cover for such ensuing loss or damage only.” The Policy also excludes “the cost of making good faulty and/or defective workmanship, materiels, or supplies, unless direct physical loss or damage by a peril insured ensues and then this policy will cover for such ensuing loss or damage only.”
On March 5, 1997, Modern entered into Contract No. 97356-C09B1 (the “C09B1 Contract”) with the CA/T Project to construct the submerged sections of the Massachusetts Turnpike/I-90 connector under the Fort Point Channel in Boston. For purposes of this case this is the Contract Works.
The C09B1 Contract called for Modem:
To construct three (3) “Immersed Tube Tunnel” (“ITT”) sections in a casting basin (a structure similar to a diydock);
To float the ITT sections into position in the Fort Point Channel;
To secure the ITT tunnel sections to each other and to the other elements of the underwater sealing and support structure;
To remove the water (“dewater”) from the excavated areas at the east and west ends of the ITTs where the Interstate 90 roadway would be connected to the ITTs; and
To construct tunnel sections connecting the ITTs with the 1-90 roadway.
Three flood events occurred on the project during the months of July and September 2001 (collectively the “Floods”).
On or about July 5, 2001, tidal water from Fort Point Channel breached its boundaries and entered the work area at the west end of the ITTs, causing flooding, and loss and damage to the Contract Works. On July 27, 2001, Modem stopped the flooding that had begun on July 5, 2001.
On or about July 27, 2001, tidal water from the Fort Point Channel breached its boundaries and entered the work area from the east end of the ITTs, causing flooding, and loss and damage to the Contract Works. On or about August 28, 2001, the east side flooding was stopped.
On or about September 2, 2001, tidal water from the Fort Point Channel breached its boundaries and entered the work area at the west end of the ITTs, causing flooding, and loss and damage to the Contract Works. On or about September 22, 2001, the rate of flooding at the west side of the ITTs increased dramatically, causing catastrophic flooding and consequent damage to the Contract Works. Modern stopped the flooding at the west end of the ITTs on or about November 21, 2001, however, Modern continued to remediate the damage through November of 2002.
Modern seeks to recover the losses it sustained as a result of the Floods under the Policy and has presented claims therefor to Zurich and ACE.
The Insurers contend that the claims are not covered and have raised as defenses Modern’s alleged concealment of material information relating to the cause of the Floods and its refusal to cooperate with the Insurers in the investigation of the claimed loss, and the deficient design and faulty workmanship exclusions quoted above.
Between July and October 2002, Modern and the CA/T Project mediated Modern’s contract claims under the C09B1 Contract, including claims relating to the Floods. The mediation did not result in any recovery by Modern from the CA/T Project with respect to the Floods.
Modern claimed that it was entitled to be paid by the CA/T Project for the remedial efforts and costs associated with the delay of its work due to the Floods in the east end of the ITTs because these Floods were the result of certain design defects and differing site conditions for which it was not responsible. Somewhat differently, Modem claimed that it was entitled to be paid for the remedial efforts and costs associated with the delay of its work due to the Floods in the west end of the ITTs because these Floods were the result of differing site conditions which made the construction work more difficult to accomplish and which “were not materially different from the types of leaks reasonably expected.”
*116 The cause of the Floods is a significant issue in Modern’s claim for coverage under the Policy.
Modern’s counsel retained Gaiy O’Neil (“O’Neil”) of McPhail Associates, Inc. and Dr. Walter Jaworski (“DR. Jaworski”) of GZA Associates, Inc. to aid in Modern’s preparation for mediation between and among Modem, the CA/T Project, and the Federal Highway Administration (“FHWA”) relating to Modem’s claims under the C09B1 Contract. O’Neil and Dr. Jaworski each prepared reports dated June 28, 2002, in which they detail their investigations, factual findings, and opinions concerning the causes of the Floods.
In addition to those received from its retained engineers, Modem also obtained additional reports and information concerning the causes of the Floods prepared by two other engineers: Dr. Donald Brace (“Dr. Brace") of GeoSystems LLC, who was retained by the CA/T Project in 2001 to assist in the development of the leak remediation plan, and Robert Bittner (“Bittner”) of Ben C. Gerwick, Inc., who prepared a report dated June 30, 2002.
In connection with his efforts to identify the source of the Floods, Dr. Brace met with representatives of Modern on a number of occasions between July and November 2001, including Robert Pine and Robert Coutts.
On October 2, 2001, the Insurer’s independent adjustor, James M. Cyr (“Cyr”), sent a letter to Modem indicating that he was investigating the losses resulting from the Floods. In the letter, Cyr identified the Policy’s exclusions for costs of making good faulty workmanship and deficient design, apprising Modem of the fact that information concerning the cause of the loss was material to the investigation and determination of coverage.
On November 1,2001, Cyr submitted to Modem the Insurers’ first written request for information concerning the Floods, which requests sought a number of enumerated categories of documents. On December 28, 2001, Modem responded to each of the enumerated requests for documents. More specifically, Modem produced to Cyr those documents responsive to enumerated categories 1 through 7 that Modem had in its custody and control. Modem stated that, with regard to categories 8 and 9, Modem was not in possession of the documents that would be responsive to those requested categories, but it would obtain those categories of documents and produce them to the Insurers.
In addition, while Modern provided Cyr with a “detailed itemization of the repairs undertaken to date” on December 28, 2001, as required by category 5, Modern further agreed to produce final costs “when compiled,” which costs were provided to Cyr on January 14, 2002.
On May 24, 2002, Cyr submitted to Modern two additional requests by the Insurers for the production of documents. By this letter, Cyr also requested the identity of any engineering consultants retained by the CA/T Project, by Bechtel/Parsons Brinckerhoff, or by Modern concerning the causes of the Floods, as well as any correspondence with these consultants.
On July 2, 2002 and August 6, 2002, Cyr sent additional letters to Modern requesting information and documentation relating to the cause of the Floods.
On August 15, 2002, counsel for Modern, Attorney Eric F. Eisenberg (“Mr. Eisenberg”), sent a letter to Cyr advising that Modern had produced all primary factual, evidentiary documents requested by the Insurers in categories 1 and 3 through 7 in the Insurers’ second request and similar documents requested by the Insurers in categories 1 and 3 through 11 in their third request. These productions, however, did not include any documents created for the mediation. As for the mediation documents, Mr. Eisenberg specifically responded as follows:
[Modem] respectfully declines to identify any consultants who may have been engaged by counsel in connection with these claims, or to produce any materials that such consultants may have prepared, as such information would be protected by the work-product doctrine and the privilege regarding identification of non-testifying experts. See, Mass./Fed.R.Civ.P. 26. See also, e.g., Remington Arms Co. v. Liberty Mut Ins. Co., 142 F.R.D. 408, 417 (D.Del. 1992) (where the court held that “the cooperation clause does not imply a duty to produce documents protected by attorney-client privilege in a coverage dispute.”). The identity of and/or materials prepared by any consultants retained by attorneys for the CA/T also would be subject to a settlement negotiation/mediation privilege and a confidentiality agreement. Such a request for information would, in any event be more appropriately directed to counsel for the CA/T.
Mr. Eisenberg thereby disclosed the fact of the mediation and the existence of the mediation materials, but declined to produce the mediation materials to the Insurers, relying on a claimed mediation privilege and the work-product doctrine.
After the inception of this action, the Insurers served a first set of interrogatories and a first request for production of documents seeking, among other filings, all documents and information concerning Modern’s investigation to determine the cause of the loss, all information and documents concerning the cause of the loss, and all documents which previously had been requested by Cyr in his May 24, 2002 letter.
On August 10, 2004, Modern provided Insurers’ counsel with a 27-page document of objections and answers in response to the interrogatories. These answers described, in some detail, Modern’s knowledge and information as to the causes of the Floods. Further, on September 3, 2004, Modern produced ten boxes of documents to the Insurers’ counsel in re *117 sponse to the first request for production. However, all mediation materials were withheld from the interrogatory answers and the documentary production.
In a Rule 30(b)(6) deposition, Cyr, who was the Insurers’ designated witness, conceded that all information and documents asked for from Modern had been produced, other than those involved in Modern’s invocation of the mediation privilege with regard to the mediation materials. This refusal to produce, on mediation privilege grounds, was the only failure to cooperate asserted by Cyr.
A few months after receiving Modem’s response to the document requests and its privilege log, the Insurers, on January 31, 2005, made a Freedom of Information Act (“FOIA”) request to the FHWA. In response, the FHWA made available to the Insurers’ counsel all documents in its possession relating to the C09B1 Contract in connection with the Fort Point Channel Tunnel, and, in so doing, inadvertently included the confidential mediation materials.
It is Modem’s refusal to produce these mediation materials upon which the Insurers base their motion for summary judgment.

DISCUSSION

The situation presents an array of issues involving the interplay between privileged materials and the duty of an insured to cooperate with an insurer on a major claim in which the privileged materials may be directly relevant to whether the claim has validity. Intertwined principally are three of the motions first described above: Modern Continental Construction Co., Inc.’s Motion to Compel Return of Inadvertently Produced Mediation Materials and Seeking Order Declaring that Mediation Materials Are Inadmissible as Evidence; Plaintiffs Motion to Strike Defendants’ Motion for Summary Judgment; and Defendants’ Motion for Summary Judgment.
The Court will first assay the status of the mediation documents as privileged materials. It will then, if necessary, determine whether those materials must be returned as having been inadvertently produced. Then the Court must face the issue of whether the failure to produce the mediation materials is a fatal breach of the duty to cooperate under the Policy, such that there can be no recovery for the claims in issue thereunder. On this latter issue, the effect of whether the mediation materials must be returned and not used in this case may be a determining factor on the summary judgment motion, among others.

The status of the mediation documents as privileged materials.

Four separate grounds are proffered to support a privileged status for the mediation materials: G.L.c. 233, sec. 23C; the settlement/negotiation privilege; the written agreement of the mediating parties; and the work-product doctrine.
G.L.c. 233, sec. 23C provides as follows:
All memoranda, and other work product prepared by a mediator and a mediator’s case files shall be confidential and not subject to disclosure in any judicial. .. proceedings involving any of the parties to any mediation to which such materials apply. Any communication made in the course of and relating to the subject matter of any mediation and which is made in the presence of such mediator by any participant, mediator or other person shall be a confidential communication and not subject to disclosure in any judicial. . . proceeding . . .
(Emphasis added.)
Modern argues first that the mediation materials, obtained inadvertently by the Insurers as a result of the FOIA request to the FHWA, fall within the emphasized position of c. 233, sec. 23C. There is little case law interpreting the reach of this statute, but what there is favors Modern’s position. For example, in Leary v. Geoghan, 2002 WL 32140255 (2002), Justice Cohen, sitting as a Single Justice of the Appeals Court on a matter pursuant to G.L.c. 231, sec. 118, para. 1, stated, “Unlike the mediation statutes in some other States, G.L.c. 233, sec. 23C confers blanket confidentiality protection on the mediation process, including an explicit prohibition on disclosure in judicial proceedings, without listing any exceptions.” In Leary, Justice Cohen, noting that the matter was one of first impression, ruled that a mediator was not required to testify regarding the terms of a settlement agreement between the parties. In doing so, she overruled a Superior Court Justice’s ruling that the privilege had been waived.
In Leary, Justice Cohen cited approvingly to Swatch v. Treat, 41 Mass.App.Ct. 559, 563 (1996), wherein a decision by a medical peer review committee under G.L.c. 111, sec. 204 was found to be privileged and not admissible or subject to disclosure in private litigation. Later, in Ayash v. Dana-Faber Cancer Inst., 443 Mass. 367, 397, and n.28 (2002), the Supreme Judicial Court held that a peer review privilege may not be waived. The policy behind Swatch and Ayash was the profound interest in the sanctity and protection of the confidentiality in which peer review committees operate, and that the willingness of persons to speak with candor before such committees would be severely hampered by disclosure of these reports. Justice Cohen in Leary applied the same policy to the mediation process.
Settlement negotiations and offers to compromise have long been protected from admissibility in evidence in Massachusetts. See, e.g., Liacos Brodin Avery, Handbook of Massachusetts Evidence (7th Edition, and 2005 Cumulative Supplement), sec. 4.6. “This rule is founded in policy, that there may be no discouragement to amicable adjustment of disputes, by a fear, that if not completed, the party amicably disposed may be injured.” Strauss v. Skurnik, 227 Mass. 173, 175 (1917). Since mediation is a recognized *118 method of amicable adjustment of disputes the protection of confidentiality applied to settlement negotiations and offers to compromise ought to apply as well to the materials gathered for and utilized in the mediation process.
Additionally, in the present situation, the mediating parties entered into a written agreement of confidentiality regarding the materials gathered for and presented at the mediation. This agreement provides yet another basis for keeping the mediation materials confidential. The agreement further demonstrates that reasonable precautionary steps were taken by the parties to the mediation to keep the material confidential. See, e.g., In the Matter of the Reorganization of Electric Mutual Liability Ins. Co. Ltd. (Bermuda) 425 Mass. 419, 422 (1997).
Finally, the work-product doctrine appears to have an application here as well. While this Court, unlike the parties, is not conversant with all of the mediation materials, it presumes that some, if not most, of those materials contain information gathered in what is traditional preparation in anticipation of litigation protected by Mass.R.Civ.P. Rule 26(b)(3) and the cases interpreting it. See, e.g., Liacos Brodin Avery, Handbook of Massachusetts Evidence (7th Edition), sec. 13.4.10.
This Court is comfortable in ruling that the mediation materials inadvertently provided to the Insurers by the FHWA, and withheld by Modern from the Insurers’ adjustor, are protectable and not admissible as evidence in this case.
Further, this Court rules that there can be no waiver of the privileged status of these mediation materials. The foregoing notwithstanding, these materials may still have a role to play in this case.

The failure to produce the mediation materials and the duty to cooperate under the Policy.

Having determined that the mediation materials cannot be used as evidence in this case, the Court must now look at the effect of not producing those materials on the viability of the Policy in issue.
The Court returns to the Policy language as a point of beginning.
The due observance and fulfillment of the terms and conditions of this Policy and its Underlying Declarations Pages by the Insured, insofar as they relate to anything done or complied with by them, shall be a condition precedent to any liability of the [Insurers] to make payment for loss under this Policy.
* * * * *
This Policy and its Underlying Declaration Pages shall be void if the Insured (as defined in Paragraph 1. Page 1.) has concealed or misrepresented any material fact or circumstances concerning this insurance or the subject thereof or in case of any fraud, attempted fraud or false swearing by the Insured touching any matter relating to this insurance or the subject thereof, whether before or after a loss.
There is no real issue as to whether the mediation materials were sought by the Insurers, first through their adjustor and later in interrogatories and document requests in this litigation. Nor is there any doubt that Modern made known its declination to produce the materials and the reasoning behind that declination.
The Insurers cite to Mello v. Hingham Mutual Fire Insurance Co., 421 Mass. 333 (1995), as support for their contention that “Even if a privilege or protection from disclosure were rightfully invoked by Modem, as a matter of law, the Policy is still rendered void by Modem’s refusal to provide the information to the Insurers.” Def. Opp. to Pltfs. Mtn. to Strike, p. 7. Mello involved a fire loss at property insured by Hingham Mutual. One of the insureds, Americo Mello, refused to submit to an examination under oath required by both the policy in question and G.L.c. 175, sec. 99. The basis for the refusal was the privilege against self-incrimination protected by art. 12 of the Declaration of Rights of the Massachusetts Constitution and the Fifth Amendment of the United States Constitution. Hingham Mutual claimed that this refusal was a material breach of the fire insurance policy, thus barring recovery thereunder.
Mello upheld summary judgment in favor of Hingham Mutual on the insureds’ refusal to cooperate even when the basis therefor were protections provided by the Massachusetts and United States Constitutions. Justice Fried, speaking for a unanimous court, summed up its holding as follows:
[The plaintiffs] argue that the Superior Court’s allowance of Hingham’s motion for summaiy judgment imposed an impermissible penalty upon the plaintiff for asserting his privilege against self-incrimination. We disagree. Where the undesirable consequences arise from the claimant’s own voluntary actions, the privilege against self-incrimination cannot be used to extricate the claimant from such a dilemma of his own making. The plaintiff voluntarily entered into a contract with Hingham, another private party. Hingham obligated itself to perform duties, some of which were contingent on the plaintiffs’ actions. The plaintiffs made a claim against Hingham for coverage, and Hingham asks that the plaintiff keep his part of the bargain even if it may harm his interests in the criminal investigation. A dilemma this may be, but it is not of Hingham’s making . . . Thus, it is not... by Hingham that the plaintiff “is compelled to furnish evidence against himself,” but by his own contractual undertaking. Therefore, we hold that the grant of summaiy judgment by the Superior Court is a permissible consequence of the plaintiffs assertion of the privilege.
Id. at 340-41.
The theoiy and analysis behind the Mello decision applies with equal force here. Repeating portions of what *119 is quoted above, but substituting Modern and the Insurers for the plaintiffs and Hingham, makes this clear.
[Modem] voluntarily entered into a contract with [the Insurers], another private party. [The Insurers] obligated [themselves] to perform duties, some of which were contingent on the [Modern’s] actions. [Modem] made a claim against [the Insurers] for coverage, and [the Insurers] ask[ ] that [Modern] keep [its] part of the bargain even if it may harm [its] interests ... A dilemma this may be, but it is not of [the Insurers’] . . . making . . . Thus, it is not ... by [the Insurers] that [Modern] “is compelled to . . . furnish evidence [by way of the mediation materials],” but by his own contractual undertaking.

Is failure to produce the mediation materials a fatal breach of the duty to cooperate under the Policy, such that there can be no recovery for the claims in issue thereunder?

In Mello, Justice Fried commented on a change in Massachusetts law brought about in the decision in Johnson Controls, Inc. v. Bowes, 381 Mass. 278 (1980). Justice Fried said:
Prior to our decision in Johnson Controls, Inc. v. Bowes, . . . the satisfaction of the insured’s duties embodied in this cooperation clause was a condition precedent to the insurer’s liabiliiy under the policy. Thus, the insured’s failure to provide notice of loss or a sworn statement of loss within the time period allotted in the policy released the insurer from its obligations under the contract. . .
In 1980, our decision in Johnson Controls, Inc. v. Bowes, supra, “modified the common law in this area by adding prejudice requirements in the contexts of notice provisions.” . . . We reasoned that the notice provisions of the insurance policies should no longer be strictly construed as a condition precedent to the insurer’s liabiliiy... Instead, the insurer must establish “both that the notice provision was in fact breached and that the breach resulted in prejudice to its position,” for its obligations to be discharged .. .
Mello, supra, 421 Mass. at 336-37.
This case is closer to that of Darcy v. Hartford Ins. Co. v. Royal Globe Ins. Co., 407 Mass. 481, 484-85 (1990) (requiring proof by insurer of prejudice for failure of insured to provide timely notice), than Fox v. Rivera, 61 Mass.App.Ct. 1123 (2004), and the cases cited therein (holding failure to submit to examination under oath is a material and substantial breach requiring no showing of prejudice by insurer).
Modern’s obligation under the Policy here was to avoid concealing or misrepresenting “any material fact or circumstances concerning this insurance or the subject thereof . . . whether before or after a loss.” What leaps out from this contractual obligation is the phrase “any material fact or circumstances.”
Modem states, and the Insurers’ adjustor and Rule 30(b)(6) witness agrees, that all information and documents asked for from Modem has been produced, other than those involved in Modem’s invocation of the mediation privilege with regard to the mediation materials. This refusal to produce the mediation materials was the only failure to cooperate asserted by Cyr.
Thus there looms a large question — did the mediation materials produced by the FHWA reveal any material facts or circumstances not otherwise provided to the Insurers by Modern?
This Court has attempted to review and understand the mediation materials and the interrogatory answers included as exhibits in the Transmittal Affidavit of Brian B. McDonough. Unaided by expert evidence, the Court does not have the technical expertise to enable it to determine whether there are material facts or circumstances presented in the mediation materials relating to the Floods that are not equivalently revealed in the interrogatory answers. Of equal, if not greater, significance, the Court has not examined — nor would it be able to examine with any technical competence — the documents provided by Modem to the Insurers in the ten or so boxes thereof referred to in the motion papers. As a consequence, this Court cannot answer the question it poses — did the mediation materials produced by the FHWA provide any material facts or circumstances not otherwise provided to the Insurers by Modem?
Without an answer to this question, the Court cannot apply the legal principles first announced in the Johnson Controls decision, and, therefore, cannot determine whether the Insurers have demonstrated that Modem’s obligation under the Policy to provide material facts or circumstances was in fact breached and that the breach resulted in prejudice to the Insurers’ position, such that their obligations to make payment for losses under the Policy may be avoided.
What this all means is that although the mediation materials have privileged status such that they cannot be admitted in evidence at trial, or to support a motion for summary judgment, they do still have a limited role to play. That role is to serve as showing, if in fact they do, that they contain material fact or circumstances concerning the subject in issue. If they do, then Mello would dictate that summary judgment should be allowed. In order to facilitate this, however, the mediation documents cannot go back to the FHWA because without them the Insurers will not be able to meet their burden.

Assessment of the remaining motions.

The Insurers ask this Court to reconsider their motion for a letter rogatory to depose Robert Bittner in California. Given this Court’s conclusion that the mediation materials are entitled to privilege protection, this Court is disinclined to permit the Bittner deposition because of the inevitability of the questioning getting into the privileged area. This conclusion, however, is not meant to prevent the Insurers from demonstrating that anything *120 Bittner may have written or provided in the mediation materials contained material facts or circumstances that were not otherwise provided by Modem.
Modem filed an emergency motion for a protective order prohibiting the depositions of any of its employees in regards to matters relating to the mediation. Given this Court’s conclusion that the mediation materials and matters related to the mediation are entitled to privilege protection, this Court is disinclined to permit the depositions of Modem’s employees on matters related thereto.
The Insurers have moved to strike an expert report by Marvin Milton (“Mr. Milton”) and to preclude his testimony at trial. Mr. Milton is a lawyer, involved in a firm of public insurance adjustors, professing expertise in interpreting insurance policies. He has submitted to counsel for Modern a June 10, 2005, letter report expressing his interpretation of the Policy in issue here. Respectfully, the interpretation of insurance policy language is a question of law for the Court. See, e.g., Chenuard v. Commerce Insurance Co., 440 Mass. 444, 445 (2004); MBTA v. Allianz Insurance Co., 413 Mass. 473, 476 (1992); Kelleher v. American Mutual Insurance Co., 32 Mass.App.Ct. 501, 503 (1992).
Modem filed another emergency motion for further protective order regarding deposition testimony from past and present employees, again relating to matters relating to the mediation. This Court has deemed the mediation and materials in connection therewith to be privileged. That, however, does not make it a bar to testimony from any person who may know or have written something about the mediation. Rather, it is Modem’s counsel’s duly to properly object, pursuant to Mass.R.Civ.P. Rule 30(c), 2nd para, when questioning reaches privileged areas.
Modem has moved to compel the Insurers to further produce documents and to allow additional Rule 30(b) (6) depositions. The Court has reviewed the materials in support of and in opposition to this motion. It concludes that no further documents need be produced. It will, however, permit the depositions of Gerhard Pagels and Joanne Massey to be taken. Those depositions must be concluded by May 26,2006, and neither should take any longer than five hours of direct examination.
Modem has also moved to compel the depositions of Peter Nicholson and Kevin Flaherty, experts designated by the Insurers. These depositions may be taken. They too, however, must be concluded by May 26, 2006, and neither should take any longer than five hours of direct examination. Still further, Nicholson’s deposition, if he insists, must be taken in or near Boca Raton, Florida.
The final motion is that of the Insurers seeking to strike alleged improper assertions in Modem’s Rule 9A(b)(5) response to their motion for summary judgment and to deem as uncontroverted certain facts. Superior Court Rule 9A is designed and intended to assist judges in assessing often mammoth summary judgment packages. It is not, however, supposed to foster a cottage industry in side disputes between parties over the contents of Rule 9A(b)(5) submissions. As the Rule says, the court need not act on any motion that does not comply with the procedure. This Court will commit no further time to this particular motion.

ORDER

For the foregoing several reasons, the Court issues the following Orders on each of the motions discussed herein:
(1) The Motion for Reconsideration of Defendants’ Motion for Letter Rogatory to Depose Robert Bittner, P.E., in California (Paper #18), is DENIED;
(2) The Plaintiffs Emergency Motion for Protective Order (Paper #21), is ALLOWED;
(3) The Defendants’ Motion to Strike Expert Testimony of Marvin Milton and to Preclude His Testimony (Paper #25), is ALLOWED;
(4) Modern Continental Construction Co., Inc.’s Motion to Compel Return of Inadvertently Produced Mediation Materials and Seeking Order Declaring that Mediation Materials Are Inadmissible as Evidence (Paper #27), is DENIED, provided that the materials may not be admitted into evidence at trial or used to support the summary judgment motion, except in the latter case to show material facts or circumstances not otherwise provided by Modem:
(5) The Plaintiffs Motion to Strike Defendants’ Motion for Summary Judgment (Paper #32A), is DENIED,
(6) The Plaintiffs Emergency Motion for Further Protective Order and Other Relief (Paper #33), is DENIED,
(7) The Defendants’ Motion for Summary Judgment (Paper #35), is DENIED, without prejudice;
(8) The Plaintiffs Motion to Compel Defendants’ Further Production of Documents and Further Rule 30(b)(6) Deposition Testimony and for an Award of Costs (Paper #39), is DENIED, except that the depositions of Gerhard Pagels and Joanne Massey may be taken, must be concluded by May 26, 2006, and neither should take any longer than five hours of direct examination;
(9) Modem Continental Construction Co., Inc.’s Motion to Compel Production of Witnesses (Paper #40), is ALLOWED, provided that these deposition may be taken, must be concluded by May 26, 2006, neither should take any longer than five hours of direct examination, and Nicholson’s deposition, if he insists, must be taken in or near Boca Raton, Florida; and
(10) The Defendants’ Motion to Strike Improper Assertions from Plaintiffs Rule 9A(b)(5) Response, to Deem Uncontroverted Facts as Admitted, and Response to Additional Facts Set Forth. Therein (Paper #43), is DENIED.

The Court regrets the time that it has taken to resolve these issues. Its constitutional retirement on December 3, 2005, and re-call as of January 3, 2006, were factors, along with an otherwise busy schedule.