Billings, Thomas P., J.
This case was tried to me, juiy-waived, over portions of five days: evidence on December 14, 15, 20 and 21, 2010, and closing arguments on January 21, 2011.1 now make the following findings of fact and conclusions of law, and enter the Order for Judgment, below.
FINDINGS OF FACT
Based on the credible evidence and the reasonable inferences therefrom, and applying the appropriate burden of proof (see the “Discussion” section, below), I find the following facts.
1. The plaintiff (“Cotter”), DOB 9/8/57, is presently 53 years of age. He is married and has a teenaged daughter.
2. In 1995, when he was 37 years old, Cotter purchased a disability insurance policy (the “Policy”) from an affiliate of the defendant Metropolitan Life Insurance Company (“MetLife”).
3. The Policy terms that are central to this case are defined as follows:
1.8 “Physician’s Care” means the regular and personal care of a Physician which, under prevailing medical standards, is appropriate for the condition causing the disability.
1.9 “Your Occupation” means the occupation or occupations in which You are regularly engaged at the time Disability begins.
1.10 “Total Disability” means that because of Injury or Sickness:
a. You are unable to perform the material and substantial duties of Your Occupation; and
b. You are receiving Physician’s Care. We will waive this requirement if We receive written proof acceptable to Us that further Physician’s Care would be of no benefit to you.
1.11 “Residual Disability”... means that due to the continuation of [an] Injury or Sickness:
a. You incur a Loss of Earnings while You are engaged in Your Occupation or another occupation; and
b. You are receiving Physician’s Care. We will waive this requirement if We receive written proof acceptable to Us that further Physician’s Care would be of no benefit to you; and
c. You are not Totally Disabled.
2.2 “Prior Earnings” means the greater of:
a. Your average Monthly Earnings for the year just before Your Disability began; or
b. Your highest average Monthly Earnings for any two successive years during the 5 year period just before your Disability began.
4. After a 90-day waiting period, the policy pays the Maximum Benefit during any period of Total Disability up to age 65. At the time Cotter became disabled, the Maximum Benefit was $5,750 per month.
5. In case of a residual disability (i.e., where the policyholder has been totally disabled for at least the 90-day waiting period, but then is able to work at a lower-paying job than before), the disability benefit is the loss of earnings, divided by “Prior Earnings,” times the Maximum Benefit. If the loss of earnings is 75% or more of Prior Earnings, however, the policy pays 100% of the Maximum Benefit.
6. In January 2000, after an episode of angina at work, Cotter was diagnosed with coronary artery disease. He had a stent implanted and was placed on medications for high blood pressure and cholesterol. No disability claim resulted from this episode; nor does he receive ongoing treatment for it other than monitoring by his primary care physician and, once every two years, by a cardiologist.
7. In 2004 Cotter was working as a Sales Manager for Asian Atlantic Industries, a broker of integrated circuits and other computer components. He had worked in this industry in various capacities for about thirteen years, twelve with a competitor—New England Circuit Sales, or NECS; name later changed to *481 “NECX” and then Converge LLC, as the company was acquired and reacquired—from which he was laid off in early 2002. After an eighteen-month hiatus to wait out a covenant not to compete, Cotter in August or September 2003joined a former NECS colleague, Tom Mahoney, in his new venture, Asian Atlantic.
8. Particularly when Cotter was working as a broker, the computer component brokerage business required long hours (in part because the party on the other side of a transaction often was in a far-distant time zone), and could be very stressful.
9. Cotter’s compensation in the brokerage business was highly variable, depending in part on his job title. In 2001—his best year by far—Cotter earned $1,248,321 working as a broker with NECX, a fact which was to have ramifications for the disability benefit he would receive under the MetLife policy. In 2001, his W-2 income was $206,642; in 2002, $62,303; and in $2003, $26,923. 2002 and 2003 were partial years, due to Cotter’s one-year absence from the workforce. In 2004, working ten months as Asian Atlantic’s Director of International Sales, he earned $96,267. In contrast to Cotter’s earlier work as a broker on commission, this was a salaried, non-commission position in which he oversaw about twenty employees and was paid a straight annual salary of $100,000 (which Mahoney promised him would improve as the company established itself).
10. In September 2004, Cotter was diagnosed with cancer of the prostate. He underwent a radical pros-tatectomy in November of that year, and experienced serious urinary incontinence following the surgery. He took a leave of absence from Asian Atlantic, and filed a disability claim with MetLife. The 90-day waiting period for benefits expired on February 6, 2005.
11. In January, Cotter learned from his boss, Mr. Mahoney, that if he did not return to work soon, he would be replaced. He returned to work on February 1, but found that he did not have the same abilities he’d had before. Cotter didn’t know what the problem was, but thought it might be something to do with his incontinence. He performed poorly and was let go after two weeks. He filed for unemployment compensation and resubmitted his claim for benefits to MetLife. The claim was allowed in March, and MetLife began paying the monthly benefit of $5,750, retroactive to February 6, 2005.
12. Cotter sought help from both his surgical urologist, Dr. Ritchie, and his medical urologist, Dr. Steele. Dr. Ritchie felt the Cotter was not recovering emotionally from the diagnosis and surgery, and referred him to a social worker at Dana Farber for counseling. Dr. Steele embarked on a course of treatment for Cotter’s ongoing incontinence issues.
13. The Dana Farber social worker referred Cotter to a counselor at Brigham & Women’s. In September 2005, he began seeing Dr. Jonathan Weiss, a psychiatrist duly licensed in Massachusetts with an office practice in Andover.
14. In conversations with his MetLife claims representative at the time, Peter Goodwin,[1] Cotter said he still did not feel able to return to the high-stress job he’d held before his disability.
15. In October 2005 Dr. Steele reported to MetLife that Cotter’s urinaiy incontinence had improved substantially and that he should be ready to return to work by November 5.[2]
16. Goodwin therefore informed Cotter that his MetLife disability benefit would terminate on November 30. He added, however, that if Cotter still felt unable to return to work, he was free to submit any additional medical information he thought pertinent.
17. On November 30, 2005 Dr. Weiss wrote the following note: “Mr. James Cotter is in treatment with me. He is not able to return to work at this time for medical reasons.” Cotter submitted the note to Goodwin on December 1 with a letter chronicling his psychological issues and treatment, and requesting that his claim be reopened.
18. Goodwin replied on December 12, saying that MetLife would reevaluate the claim and had written to Dr. Weiss for information, and asking that Cotter have Dr. Weiss complete an Attending Physician’s Statement at his next appointment on December 22. Weiss did so, diagnosing Cotter with “Major depression, single episode, severe,” and noting, “Gradual stabilization anticipated.” By February 8, 2006, however, Dr. Weiss’s diagnosis had changed to “Major depression, recurrent.” This diagnosis remained constant through 2010, as did Dr. Weiss’s treatment: prescriptions for Wellbutrin and Cymbalta, and an appointment every six weeks for a medication check and “supportive therapy.”
19. Cotter, out of work since the fall of 2004, was considering a career change to a less taxing, more people-and service-oriented field. He thought about nursing and teaching, and settled on the latter. In mid-2006 he took and passed the qualifying exams in History, Communication and Literacy Skills, and Business. That fall he began working in the Somer-ville public schools, first as a substitute special education teacher, then as a one-on-one aide to a student with autism. The latter position paid a salary of $14,273.
20. MetLife continued Cotter’s benefit without complaint through 2006. By early 2007, however, it was growing restive. The file was reassigned to new claim representative, April Allard, who wrote to Cotter and suggested, among other things, that MetLife might want him to undergo an independent medical examination. Cotter wrote back with some information that Allard had requested, and said he was open to undergoing an IME.
*482 21. Allard set up two examinations: one with Dr. Lawrence Fieman, a neuropsychologist, the other with Dr. Ronald Schouten, a psychiatrist.
22. Dr. Fieman interviewed Cotter and administered the Minnesota Multlphasic Personality Inventory (“MMPI”) test on March 16, 2007. He found no evidence of major depression or anxiety disorder, and noted that Cotter scored “well within the normal range” on the MMPI’s depression scale, but that his subjective complaints of fatigue and lack of focus “are not addressed via [the] MMPI.” He saw no signs of either during the interview, and noted that Cotter had taken the 567-question MMPI in a single session beginning after 4:00 p.m. on a Friday, following a full day’s work and an hour’s drive through a snowstorm. Based on the interview, the MMPI results, and his review of the clinical history, Dr. Fieman “found no significant psychological barriers to full time employment.”
23. On April 6, Cotter went for a three and one-half hour interview with Dr. Schouten, who also did a medical records review. Dr. Schouten’s report noted and credited Cotter’s self-report that he has difficulty focusing and concentrating on tasks, that stress, pressure, and decisionmaking overwhelm him, and that the multitasking required in his former employment with the brokerage firms would be impossible for him. Cotter was worried about his medical conditions and his family’s reduced financial status but fearful of having to return to anything like his former high-stress job. At the same time, he received satisfaction from his current, lower-stress and more rewarding teaching occupation.
24. Dr. Schouten noted Cotter’s description of himself as depressed and worried, but agreed with Dr. Fieman that diagnoses of major depression or anxiety disorder were inapplicable. He did diagnose chronic adjustment disorder with mixed depression and anxiety, related to his medical history and his fears that he will succumb to heart disease or cancer. Cotter’s complaints of inattention and difficulty in concentrating were supported in Dr. Schouten’s mental status exam, and were “consistent with anxiety and depressive symptoms, but the role of his multiple medications”—at least five of which can have CNS side effects[3]—"cannot be ruled out."
Most importantly, it is clear from examination of Mr. Cotter that he has suffered what can only be described as an existential crisis as a result of his medical problems. This has led him to question the meaning of life, his career choices, and how he has provided for his family. He is now drawn to a vocation that is less stressful and provides him with emotional fulfillment. He feels that [MetLife] should just abide by the contract and pay him the benefits so he can do something positive with his life.
25. In Dr. Schouten’s view,
Mr. Cotter’s current symptoms do appear to be interfering with his ability to return to work ... At present, Mr. Cotter’s attentional difficulties would interfere with his ability to handle multiple high-pressure business transactions.
****
Mr. Cotter is exhausted and frightened by his medical condition, and fearful of the prospect of trying to return to his old job and not performing adequately. He has little motivation to return to his old position and clearly prefers his current lifestyle. While his current financial position is much worse than when he was working, it is better than it would be if he were to return to work and was fired ... At this point, Mr. Cotter does not see [his former] job as being a good fit for him. Mr. Cotter does appear to have accepted the role of being chronically ill.
26. Dr. Schouten recommended that Cotter’s “medications [be] reassessed for their possible effects on his energy level, attention and concentration, and anxiety. He should also be engaged in cognitive behavioral therapy aimed at reducing his anxiety and reaching a better level of adjustment regarding his medical condition.” This last should consist of “weekly psychotherapy with an emphasis on anxiety management and cognitive behavioral therapy, and occupational rehabilitation services”; this, he felt, “would optimize his clinical and occupational functioning.” Also, Cotter should undergo additional “neuropsychological assessment to distinguish objective from subjective cognitive problems.” “If motivated to return to his former occupation,” Schouten concluded, “and if the cause of his attentional problems can be identified and addressed, Mr. Cotter should be able to return to work,” likely within six months.
27. On March 1, 2007 Allard had written to Cotter to request that he assist MetLife in getting Dr. Weiss to respond to its requests for records. Weiss finally did complete and fax an Attending Physician’s Statement on April 24, 2007. For the first time, in response to the question, “Is return to work a focus of the treatment plan?” Weiss answered “No,” and explained, “Pursuing alternate employment.”
28. On May 2, Allard wrote to Dr. Weiss, enclosing copies of Dr. Fieman’s and Dr. Schouten’s reports. Her letter continued:
Based on the information you provided on the Attending Physician’s Statement dated April 24, 2007, it appears Mr. Cotter’s return to his prior work is not a focus of your treatment plan with Mr. Cotter as he has pursued alternative employment.
Please review Dr. Fieman’s and Dr. Schouten’s reports. We are aware of very specific treatment recommendations, specifically from Dr. Schouten, which are relevant to Mr. Cotter’s return to his prior work within 6 months.
*483 Following review of the enclosed reports, please contact our office regarding what treatment you and Mr. Cotter will be pursuing.
The letter closed with Allard’s contact information.
29. Dr. Weiss responded with a voicemail, left on May 21 while Cotter was present in the office with him:
Okay, the short answer is that if you read the report of Dr. Schouten, he goes on after exhaustive evaluation in which he concludes that Mr. Cotter is not at all motivated to return to his former job, that he has had what he calls an “existential crisis” and is now pursuing a different vocation. And then in his conclusion he basically says, “so let’s get Mr. Cotter motivated to return back to his former job within six months."
And that’s the end of it. [Dr. Weiss chuckles.] Mr. Cotter is not motivated to return to his former job. He is pursuing another vocation. That is the focus of our treatment, and the fact that Dr. Schouten wants to get him motivated does [not] change things. So thank you very much.
Dr. Weiss, too, closed by leaving phone and a fax number.
30. Dr. Weiss reinforced the message in his next Attending Physician’s Statement, dated May 21,2007. Asked, “Are there secondary conditions impairing your patient’s work capacity,” Weiss replied: “Patient not motivated to return to former employment.” In response to the question whether return to work was a focus of treatment, he said “Not to former employment, yes to different vocation.” In “Additional Remarks,” Dr. Weiss was equally explicit: “Treatment goal focused on change in occupation.”
31. Allard wrote to Cotter on June 4. Mentioning Weiss’s phone message of April 21 and his letter of a month later, she drew the logical conclusion: “[I]t appears Dr. Weiss is not open to discussing any treatment recommendations outlined by Dr. Schouten.” She reminded Cotter of the “appropriate care” clause in the policy and said, “We believe Dr. Schouten has provided us with specific recommendations for care which is appropriate for your condition and we will continue to closely evaluate your claim and your treatment with Dr. Weiss to determine if you are indeed receiving care appropriate for your condition.” Finally, she said, his file was being forwarded to a medical consultant for review.
32. The medical consultant was Dr. John Szlyk, an in-house psychiatrist. In a report dated June 5, 2007, he recommended monitoring the situation to see if Cotter and Weiss followed any of Dr. Schouten’s recommendations, noting that there has been no clinical evidence that the insured’s focusing on RTW [return to work] with the support of a comprehensive treatment plan would be detrimental."
33. On June 20, 2007 Allard wrote to Dr. Weiss again, stating her understanding “that you do not disagree with Dr. Schouten’s analysis and recommendations if Mr. Cotter was interested in returning to his former occupation,” and “that Mr. Cotter is not interested in returning to his former occupation and you will not be pursuing the recommendations outlined by Dr. Schouten.” She asked that Weiss confirm her understanding within one week.
34.Dr. Weiss responded on June 25 with the following:
Dear Ms. Allard,
I have reviewed Dr. Schouten’s report and discussed it with Mr. Cotter. Mr. Cotter is not motivated or interested in returning to his former occupation. I should note that I also do not recommend he pursue his former employment, as to do so would certainly severely exacerbate his psychiatric and physical conditions, and likely incapacitate him. He is pursuing other, less stressful, employment.
Dr. Schouten’s report describes Mr. Cotter as not motivated to return to his former occupation and I agree with this.
Dr. Schouten’s recommendations apply to a hypothetical situation, and I do not disagree with his recommendations in that context. However they do not address the reality of Mr. Cotter’s current psychiatric and physical condition, and his change of career goals. These matters are being addressed in Mr. Cotter’s current treatment with me.
Please contact me if I may be of further assistance.
35.1 interpret Dr. Weiss’s June 25 letter as saying that Cotter would be harmed if he were to return to his old employment in his then current state, and that while he agreed with Dr. Schouten’s recommended treatment plan for a “hypothetical” patient who wished to resume his prior, stressful job, it was not appropriate for Cotter in view of his desire to change careers. Weiss did not opine—in this letter or ever—that Dr. Schouten’s treatment plan was likely to harm Cotter, or that it stood no reasonable likelihood of re-enabling him for his prior occupation.
36. Allard wrote to Cotter on July 30. She stated, in part:
In order to meet the definition ofTotal Disabilityyou must be receiving care which is appropriate for the condition causing your disability. We believe the Independent Medical Evaluation (IME) Provider, Dr. Schouten, has provided us with specific recommendations for care which is (sic) appropriate for your condition and we are continuing to closely evaluate your claim and your treatment with Dr. Weiss to determine if you are indeed receiving care appropriate for your condition.
She asked for a description of his summer activities and a new medical records authorization, and promised to keep him updated on the status of his claim. *484 Cotter wrote back on August 10, describing several job prospects working with handicapped students and mentioning that he was looking into training as a guidance counselor.
37. On August 30 Allard provided Dr. Szlyk with updated medical records, and posed several questions to him. Dr. Szlyk responded on September 6, opining that Dr. Schouten’s recommendations for a medication review, cognitive behavioral therapy, focus on occupational issues to return him to his former occupation, and further neuropsychological testing had not been followed. He noted Dr. Weiss’s comments that Cotter had chosen to pursue a new career instead of returning to his former occupation, and that his treatment of Cotter was geared to that end, and suggested a Physician to Physician Call to discuss these issues directly with Weiss.
38. The Physician to Physician Call was approved, and a Unum administrative assistant called Dr. Weiss on September 7 to set it up. The doctor took the call, but requested that the assistant relay the following message to Dr. Szlyk: “I am really tired of talking about Mr. Cotter and I have nothing new to say.” The assistant incorporated the message in a memo to Allard, her supervisor, and Dr. Szlyk.
39. MetLife/Unum ruminated on the matter internally for a few weeks longer, but on October 1, 2007 Allard dropped the other shoe in a ten-page letter to Cotter. After a painstaking review of the claim history—in which Dr. Schouten’s report and recommendations were prominently featured—she quoted several pertinent policy provisions, including the requirement for, and definition of, “Physician’s Care.” In her summation:
You have an obligation to act in good faith and to seek that care which will permit you to return to work. The policy requires that you act reasonably to limit the nature and extent of your disability.
She noted that Dr. Weiss did not dispute the appropriateness or reasonableness of Dr. Schouten’s suggested treatment plan, but had not implemented it due to Cotter’s decision not to return to his former occupation.
It is your right to choose not to pursue the care that would return you to your occupation. However, in order to continue to receive benefits, it is your obligation under the terms of your policy to obtain curative treatment that is available and which is reasonably expected to allow you to return to work. Therefore, we have concluded that you are no longer eligible for benefits under the terms of your policy.
Allard closed by notifying Cotter that MetLife had filed this declaratory judgment action[4] (enclosing a copy of the complaint); that it would continue to pay benefits under a reservation of rights; and that this meant that payment could not be construed as an admission of liability and that if successful in the court action, MetLife would seek reimbursement of any benefits paid during the pendency of the case. She asked that he continue to provide monthly claimant’s and attending physician’s statements.
40. The day after Allard sent her letter, Cotter was offered a position as the Director of Day Supports for the Walnut Street Center, a non-profit facility in Som-erville providing daycare for mentally disabled adults. The job paid $60,000 to start; the salary was later increased to $65,000. He took the job and worked at it for two years, while still receiving the $5,750 monthly benefit from MetLife.[5]
41. Unfortunately, Cotter was terminated from the Walnut Street Center in October 2009 for failure to keep proper records, a failing that he attributes in part to his difficulty in concentrating. He has looked for comparable employment, but has received no offers. At the time of trial, he was still unemployed.
42. Cotter kept MetLife informed of his various employments, reporting that the Walnut Street job provided “a fairly stress free environment” where he did not experience the anxiety of long hours, making quotas, and managing salespeople as in his prior employment.
43. Dr. Weiss, too, has continued to submit Attending Physician’s Statements—not always monthly, but much more regularly than before. The information on them is more or less constant—Cotter suffers from “mild” or “moderate” depression and anxiety, except that his depression “worsened” to “Major Depression, Recurrent” around the time he lost the Walnut Street job. Difficulty with concentration/attention and memory and intolerance of stress are mentioned frequently; dysthymia and lability less often. Consistently, Dr. Weiss writes that Cotter “cannot return to former occupation” and “cannot participate in stressful situations.” A. focus of his treatment is “Return to work in alternate occupation.”
44. Lacking from Dr. Weiss’s statements is any suggestion that Cotter is undergoing cognitive behavioral therapy, or any other modality geared toward re-enabling him to work at his former occupation. The treatment rendered—Wellbutrin (an antidepressant) and Cymbalta (for depression and anxiety), plus “supportive therapy”—has not changed, so far as appears from the Physician’s Statements; nor is there any suggestion that Weiss or Cotter has pursued a review of these or of his non-psychiatric medications, or additional neuropsychological testing.
45. So far as appears, Cotter’s condition has remained the same, except that his depression worsened after he lost his job. There is no indication in Weiss’s communications that the “(g)radual stabilization anticipated” in his Physician’s Statement of September 22, 2005 has materialized, or that Weiss has adjusted his treatment plan as a result.
*485 46. Over two days in February 2010, Cotter was examined by Dr. Thomas Deters, a neuropsychologist retained by MetLife.[6] Dr. Deters reviewed medical and employment records, the reports of Drs. Fieman and Schouten, several depositions, and other records, interviewed Cotter extensively, and administered a number of neuropsychological tests (not including the MMPI, which Dr. Fieman had given).
47. Cotter tested in the average to high-average range overall, with a full-scale IQ at the 75th percentile (right on the borderline between average and high average). His test results did not suggest that his cognition is impaired by depression, and with the exception of a sleep disorder (now resolved), he reported none of the classic (“SIGECAPS”[7]) symptoms of depression. Dr. Deters therefore disagrees with Dr. Weiss’s diagnosis of major depression, and also with his treatment plan.
48. Dr. Deters feels that Cotter suffers from an adjustment disorder brought on by the trauma of his cancer diagnosis and treatment, which would best be treated by regular talk therapy; in particular, cognitive behavioral therapy, which is now a standard, accepted, and effective tool in the practice of psychotherapy. He should not be treated with psychotropic medications, which are not needed in his case and can have adverse effects.
49. I found Dr. Deters’s testimony generally credible. His opinion that Cotter does not suffer from major depression was consistent with the findings of Drs. Fieman and Schouten, though I note that Dr. Weiss— whose diagnosis is major depressive disorder—has a more thorough and longstanding familiarity with this patient than do any of the other three. I also find it unnecessary, however, to resolve the issue of whether Cotter does or does not suffer from a major depressive disorder, absent any evidence that the treatment recommendations in Dr. Schouten’s report would be ineffective or contraindicated in a patient with depression.
50. MetLife has continued to pay Cotter the full $5,750 monthly benefit throughout the period of the reservation of rights. For the period October 1, 2007 through December 31, 2010, those benefits totaled $224,250 (39 months @ $5,750).
51. Cotter accepted the checks, and has responded to MetLife’s periodic requests for information on his medical and employment status. At no time, however, did he indicate agreement with MetLife’s position that he was not entitled to benefits, or that in the event of a court determination to this effect he would be responsible for reimbursing MetLife for any of its payments to him.
52. The Policy and its attached Schedules nowhere address the consequences of payment under a reservation of rights, or suggest that the insured may be liable to repay the insurer under any circumstances for benefits paid him. It does provide, at ¶ 10.1, that the Policy and its attachments constitute “the entire contract between You and Us.”
53.MetLife’s conduct toward Cotter throughout has been fair and non-deceptive. When it doubted his eligibility for continued benefits, it told him so and the reasons. It investigated the case deliberately and thoroughly. It communicated in full the treatment recommendations of its consultant and the reasons for them. Once it denied coverage, it instituted this declaratory judgment action, wrote Cotter a detailed letter explaining the situation, and continued to pay him the monthly benefit (albeit stating that it would seek reimbursement if its position were upheld in this action). There is thus no basis for imposition of liability under G.L.c. 93A or c. 176D.[8]
DISCUSSION
“The insured bears the burden of establishing coverage.” Boazova v. Safety Ins. Co., 78 Mass.App.Ct. 438, 440 (2010). This burden extends to proving disability, see Arabia v. John Hancock Mut. Life Ins. Co., 301 Mass. 397, 402 (1938), and where the policy has an “appropriate care” clause (see text below), to proving that the insured is receiving appropriate care from a physician. See Reznick v. Provident Life and Accident Ins. Co., 364 F.Sup.2d 635, 637 (E.D.Mich. 2005) (applying Michigan law); Doe v. Provident Life and Accident Ins. Co., 1997 WL 799439 (E.D.Penna. 1997) at *6.; cf. Lustenberger v. Boston Casualty Co., 300 Mass. 130, 135 (1938) (insured bore the burden of proving that he was “under the regular care of a legally qualified physician or surgeon other than himselF). The fact that MetLife commenced the declaratory judgment proceeding and therefore, for caption purposes, occupies the role of plaintiff does not alter the burden of proof. Stop & Shop, Inc. v. Ganem, 347 Mass. 697, 703-04 (1964); Haskell v. Versyss Liquidating Trust, 75 Mass.App.Ct. 120, 126 (2009).
The parties’ dispute centers principally on the meaning and effect of paragraphs 1.8, 1.10, and 1.11 of the Policy. The latter two paragraphs specify that in order to quality as having a total or a residual disability, the insured must be “receiving Physician’s Care.” Paragraph 1.8 defines “Physician’s Care” as “the regular and personal care of a Physician which, under prevailing medical standards, is appropriate for the condition causing the disability." (Emphasis supplied.)
The latter part of this clause, requiring that the care be “appropriate for the condition causing the disability,” is a feature of many but by no means all disability policies. Where it is absent, “the majority of courts will not imply an appropriate treatment requirement.” Provident Life & Accident Ins. Co. v. Henry, 106 F.Sup.2d 1002, 1004 (C.D.Cal. 2000), citing Casson v. Nationwide Ins. Co., 455 A.2d 361, 366-67 (Del.Super. 1982). In such a case, therefore, the only issue is whether the insured is in fact under the regular care—meaning “charge, oversight, watchful *486 regard and attention”—of a physician, Lustenberger, 300 Mass. at 135; if so, there is no occasion for a court to examine the quality or appropriateness of the care.[9]
Cases interpreting “appropriate care” clauses,[10] by contrast, have held that the policy imposes a duty on the insured “ ‘to avail himself of all reasonable means and remedies to remove’ any impediment that purportedly causes a . . . disabling condition.” Mack v. Unum Life Ins. Co. of America, 471 F.Sup.2d 1285, 1289 (S.D.Fla. 2007) (citation omitted). As one court said of language virtually identical to that in MetLife’s policy,
[T]he appropriate-care provision here creates an explicit duty to seek and accept appropriate treatment. The policy provision is broad and unambiguous . . . [T]his appropriate-care provision does not merely state the insured must be under a doctor’s care. It provides the insured must receive from a doctor the appropriate care for his condition. The only reasonable interpretation of this clause is that it imposes a duty on the insured to seek and accept appropriate care for his disabling condition.
Provident Life & Acc. Ins. Co. v. Henry, 106 F.Sup.2d 1002, 1004-05 (C.D.Cal. 2000); accord, Reznick v. Provident Life & Acc. Ins. Co., 364 F. Sup.2d 635, 638 (E.D.Mich. 2005).[11]
Henry also supplies the most cogent, workable, and widely-cited definition of what is “appropriate care”: it is “determined objectively as the treatment a patient would make a reasonable decision to accept after duly considering the opinions of medical professionals.” 106 F.Sup. at 1004. This seems as good a definition of “appropriate care” as one is likely to find, [12] and I adopt it for this case.
Several cases have stated clearly, and I agree, that requiring that the insured to seek and accept appropriate care for his disabling condition as a contractual condition of receiving disability benefits does not im-permissibly impinge upon the patient’s undoubted right to make his own decisions concerning his health care. Henry, 106 F.Sup.2d at 1005; Paul Revere Life Ins. Co. v. DiBari, 2010 WL 4876054 (D.Conn. 2010). There is less unanimity—indeed, less explicit discussion—concerning the role of the treating physician and his recommendations in the determination of whether care has been “appropriate.” Sometimes, the cases phrase the insured’s duty in terms of an obligation to follow his treating doctor’s advice. E.g., Mack, 471 F.Sup.2d at 1290-91 (appropriate care requirement “is concomitant with the insured’s seeking and accepting the care that is appropriate for a disabling condition as determined by a treating physician”).
Other cases have held explicitly that substandard care by a treating physician may still satisfy the “appropriate care” requirement, so long as the patient is compliant. The most pointed of these is Morinelli v. Provident Life & Acc. Ins. Co., 242 Mich.App. 255, 617 N.W.2d 777, 782 (2000). There, the appellate court remanded the case for entry of judgment n.o.v. for insured after a verdict for insurer, who had defended on the basis that the insured’s doctor provided substandard care for his diabetes. Said the Court of Appeals:
It is this Court’s opinion that the language found in the policy is not ambiguous and that “appropriate care” does not require a qualitative evaluation of the care provided. The policy does not state that to recover benefits under the policy, the insured must receive “appropriate care”; rather, the contract states that the care received must be “appropriate for the condition causing the disability.” Care “appropriate for the condition causing the disability” is care that is necessary and causally related to the condition forming the basis of the disability claim. It cannot be disputed that the insured in this case was receiving care from a licensed physician, acting within the scope of his license, that was appropriate to the treatment of diabetes (i.e., instruction on diet and exercise, periodic office visits, and the prescription of insulin). It was [the defense expert’s] testimony and defense counsel’s closing argument that cast specific doubt on the “appropriateness” of the care that Morinelli received. If this case involved a claim for medical malpractice, a determination of the standard of care and whether that standard was met would surely be in order. This case, however, involves an insured making a claim under his disability policy. As such, whether the level of treatment met the standard of care is not pertinent to a determination of whether the care was appropriate.
See also Sebastian v. Provident Life & Acc. Ins. Co., 73 F.Sup.2d 521, 529 (D.Md. 1999) (crediting insured’s expert’s testimony that treating doctor’s prescription of antidepressants for insured’s bipolar disorder was still appropriate care, where early misdiagnosis of bipolar disorder as major depression is common, and antidepressants, though “not the ideal treatment,” can still help the bipolar patient).
At least two cases have held, however, that a patient’s compliance with his treating doctor’s course of treatment, when coupled with the doctor’s acceptance of the patient’s preference not to undergo available, promising, but more aggressive treatment, did not constitute “appropriate care.” In DiBari, supra, the insured’s internist (Dr. Campo) addressed his carpal tunnel syndrome with “conservative treatment” and “medical management” (NSAIDs and ice packs), without success. The insured saw a neurologist (Dr. Xistris), who discussed carpal tunnel release surgeiy with him, explained that it was a simple procedure with a 90% success rate, and told him he had no contraindications for the procedure. The insured reported back to Dr. Campo that he was “not comfortable” with having surgeiy, and Dr. Campo—while not feeling that surgery was medically inappropriate for his patient—supported and agreed'with him in his decision not to have it; he therefore continued treating *487 him medically as before, while believing that these would not improve the patient’s condition to the point where he would be able to resume his prior occupation as a dentist. In a letter to the disability insurer reminiscent of Dr. Weiss’s communications in this case, Dr. Campo wrote: “After careful consideration, I believe that surgeiy is not justifiable at this time, as the symptomatology is extreme only when attempting to cany out the duties of his profession.” (Emphasis supplied.) The court, after a detailed discussion of the risks and benefits of the release surgeiy procedure, held that Dr. DiBari had failed in his duty to seek and accept appropriate care, and granted summary judgment for the insurer.
The second case is Doe v. Provident Life & Acc. Ins. Co., 1997 WL 799439 at *4 (E.D.Penna. 1997), in which the court denied the insured’s motion for judgment n.o.v. after an adverse jury verdict. The court found that “there is evidence in the record to support the finding of the jury that the care rendered by [the insured’s treating psychiatrist] was not appropriate in that there was, among other things, a lack of a treatment plan and a lack of a vigorous effort to enable Doe to return to work” at the practice of law. Id. (*5). The juxy might have reasonably been persuaded, the court held, by the defense expert’s testimony that the treating psychiatrist “was grossly in error” in his diagnosis and had “not offered the optimal range of available psychologic or psychiatric treatment,”
and that Doe “chose not to practice law any more. He chose to smell the roses and change his lifestyle. He told me that he made that choice with [his treating psychiatrist] about a month into his treatment and is pursuing it ever since.”

Id.

Taken together, these cases illustrate the complexities of the human response to a disabling illness or injury, and of the medical and legal issues posed thereby. In many instances, the insured will be motivated to strive toward a full recovery; his physician will provide capable treatment toward that end; and either the end will be achieved or the disability benefits will continue. In some (hopefully, not many) cases, the physician may treat incompetently, jeopardizing the patient and, perhaps, his disability benefit. Morinari and DiBari were such cases, albeit with different legal outcomes.
In still other cases, the patient may decide on a change of lifestyle that does not involve returning to his prior occupation, and a medical provider may gear his treatment to the patient’s redefined goals. The doctor may be operating within the standard of care—he is, after all, attempting to achieve his patient’s objectives—and his care may therefore be “appropriate” in that sense. Nonetheless, it is not “appropriate” care in the sense required by the disability policy, because it does not treat “the condition causing the disability,” that is, the “Injuiy or Sickness” that caused the insured to be “unable to perform the material and substantial duties of [the] Occupation” in which he was “regularly employed at the time Disability be[gan].” (Policy, ¶¶1.8, 1.9, 1.10.) Doe was such a case, as was DiBari.[13] So is the case before me.
MetLife offered at trial, and suggested to Cotter years ago, a plan of therapy geared toward re-enabling him for the occupation he left due to disability. Cotter has offered no evidence that Dr. Schouten’s recommendations did not comply with prevailing medical standards, or that they had no reasonable likelihood of success, or that they posed any risk to Cotter’s physical or mental well-being; indeed, he offered no expert testimony whatsoever. The only glimmer I have of the counter-arguments, from a medical perspective, come from the correspondence and other documents authored by Dr. Weiss, who was clear (1) that he did not disagree with Dr. Schouten’s recommendations for a patient who was motivated to resume his former occupation, but (2) that his patient was not motivated or interested in this, and (3) that he was treating him accordingly.
Unlike Mr. Doe, Cotter has not elected to “smell the roses.” He has decided on a new human-services career that is productive, personally rewarding, and also is less stressful and considerably less remunerative than his former work in the electronics brokerage industry. His choice is to be admired, not faulted, and perhaps Dr. Weiss’s therapeutic plan is appropriate to this new vocation (though one may still wonder what would be wrong with working toward a full recovery, if that is in the realm of possibility). It is not, however, care that is “appropriate for the condition causing the disability” that has disabled Cotter from his prior employment, as the policy and the caselaw require.
It follows that judgment is to enter for MetLife, declaring that from October 1, 2007 forward, it has had no obligation to pay benefits to Cotter under the disability policy. It does not follow, in the absence of an express or implied contract to this effect (of which there is none in this case), that Cotter is liable to reimburse MetLife for benefits it has paid him under a reservation of rights. Cf. Medical Malpractice Joint Underwriting Ass’n of Massachusetts v. Goldberg, 425 Mass. 46, 56-62 (1997) (liability insurer which defended under a reservation of rights and unilaterally settled claim after adverse verdict not entitled to reimbursement from insured even if there was no coverage, absent a policy provision or other express agreement to this effect; insured’s acceptance of defense while maintaining that there was coverage did not create implied agreement to reimburse costs of defense or of settlement).
Finally, there is Cotter’s counterclaim for violations of Chapters 93A and 176D of the General Laws. An insurer which correctly denies a claim has not violated
*488 either statute. See Transamerica Ins. Co. v. KMS Patriots, L.P., 52 Mass.App.Ct. 189, 197 (2001), and cases cited. Even if MetLife’s assessment had been incorrect, moreover, there was a good-faith basis for it, and MetLife proceeded appropriately to put the issue before a court. Compare Premier Ins. Co. of Mass. v. Furtado, 428 Mass. 507, 510 (1998) (no statutory violation where insurer with a good-faith but mistaken belief concerning its obligations put policy limit in interest-bearing bank account and commenced declaratory judgment action); Boston Symphony Orchestra, Inc. v. Commercial Union Ins. Co., 406 Mass. 7, 15-16 (1989) (“the availabilily of an action for declaratory relief should not be ignored by insurance companies” whose obligations to the insured are in dispute). MetLife’s conduct toward Cotter has been above-board and scrupulously fair throughout. It follows that Cotter is not entitled to recover on his counterclaim.
ORDER FOR JUDGMENT
For the foregoing reasons, it is hereby ORDERED that judgment enter, (1) adjudging and declaring that it has no continuing obligation to pay benefits to the defendant under the disability policy; (2) adjudging and declaring that Cotter is under no obligation to reimburse MetLife for any of the benefits paid him; and (3) dismissing the Counterclaim, the plaintiff-in-counterclaim to take nothing.

Both Goodwin and the representative who would later take over the file, April Allard, had the title “Lead Disability Benefits Specialist." Both were employed by the Unum Group, a subsidiary of Paul Revere, which handles MetLife’s disability claims under contract.

here is no evidence that Cotter’s prostate cancer, which had not spread beyond the capsule at the time of surgery, has recurred or metastasized.

Nhese were: Prilosec (for gastroesophageal reflux), oxy-butynin (for overactive bladder), Lisinopril (for high blood pressure), Cymbalta (for depression and anxiety), and Wellbutnn (for depression).

This case was filed on September 28, 2007.

I note that April Allard’s letters to Cotter have consistently referred to his claim as one for Total Disability, even after he had begun working again. Because of his $1.2 million in earnings in the year 2000, the Policy’s provision that provides that if the Loss of Earnings is at least 75% of Prior Earnings the company pays the Maximum Benefit, and the five-year lookback for computing Maximum Earnings (¶2.2), it did not matter whether Cotter was deemed totally or residually disabled: so long as his new employment paid him less than $181,870 per year (25% of the average of his two highest successive years in the last five), his benefit (if any) would be the full $5,750 Maximum Benefit.

I note here that after both sides had submitted their proposed findings of fact and conclusions of law, MetLife filed an emergency motion to strike certain paragraphs in Cotter’s proposed findings that summarized selected portions of Dr. Deters’s report. Deters, a clinical neuropsychologist who examined Cotter at MetLife’s request, testified at trial. His report is not in evidence, though he testified as to his findings; some of these were displayed on a chalk; and Cotter’s counsel cross-examined, to a limited extent, from the report. MetLife says the report was excluded because Cotter’s objection to it was sustained; Cotter replies that since MetLife offered the report, it should not be heard to object to it now. Whatever the reasons, the report is not part of the evidence in the case, meaning (among other things) that I do not have access to it. I have therefore allowed MetLife’s motion to strike, and have relied on Dr. Deters’s testimony for an account of his findings and the reasons for them.

Sleep disturbance; Lost Interest in activities; Feelings of Guilt; Loss of Energy; Problems with Concentration/Cognition; Diminished Appetite; Psychomotor disturbance; and Thoughts of Suicide.

Cotter argues at length that MetLife behaved deceptively when it provided Dr. Schouten with specific questions to answer, and then shared with Dr. Weiss (who shared it with Cotter) Schouten’s report, which included the answers but not the questions. To the extent that this argument is even comprehensible, I acknowledge the underlying facts—the documents are what they are—but reject the conclusion as a factual matter. The fact that Schouten was answering specific questions was not a secret; this section of the report is titled “Responses to Specific IME Questions,” and gives his answers but does not state the questions. There is no evidence that MetLife directed Dr. Schouten to omit the questions from his report, or that Cotter or anyone on his behalf requested or was refused information about them, or that any of this matters.

Cotter’s extensive reliance on the Lustehbarger case is thus misplaced: the policy language applied there was fundamentally different from that at issue in this case. For other examples of Massachusetts cases applying such bare-bones “regular care” clauses, see Shaw v. Commercial Ins. Co., 359 Mass. 601, 608-09 (1971); Brickley v. Equitable Life Assurance Company, 19 Mass.App.Ct. 952, 953 (1985); and Michael v. Trustmark Ins. Co., 2003 WL 21030177 [16 Mass. L. Rptr. 245] (Mass.Super. 2003; Hines, J.).

 So far as I am aware, there are no such reported cases from Massachusetts.

That the difference between a “regular care” and an “appropriate care” requirement can be outcome-determinative is illustrated by the Henry case, as well as Provident Life & Acc. Ins. Co. v. Van Gemert, 262 F.Sup.2d 1047 (C.D.Cal. 2003), and Buck v. Unum Life Ins. Co., 2010 WL 887379 (N.D.Cal. 2010). In each of these cases the insured, who was under a doctor’s care but had declined medically indicated surgery for carpal tunnel syndrome (.Henry and Buck) or a cataract (Van Gemert), had multiple disability policies. Each lost his claim on the appropriate-care policy but prevailed on the regular-care policy.

Compare the less informative formulations in Morinelli v. Provident Life & Acc. Ins. Co., 242 Mich.App. 255, 617 N.W.2d 777, 781-82 (2000) (“ ‘particularly suitable; fitting; compatible; . . .’[sluitable for a particular person, condition, occasion, or place; proper; fitting’ ”), and in Sebastian v. Provident Life & Acc. Ins. Co., 73 F.Sup.2d 521, 529 (D.Md. 1999), and Doe v. Provident Life & Acc. Ins. Co., 1997 WL 799439 at *4 (E.D.Penna. 1997) (“Appropriate means suitable under the circumstances. It does not mean perfect care, or best possible care”).

I find the Resnick case, which MetLife additionally cites on this point, to be distinguishable. There, the insured refused to follow his therapist’s recommendation of more frequent and regular sessions, and was therefore held to have failed in his obligation to receive appropriate care. There is no evidence in this case that Cotter has been noncompliant with Dr. Weiss’s treatment plan in any respect.